ESTATE OF HELENE SIMMONS, DECEASED, FIRST NATIONAL BANK IN HOUSTON, TEMPORARY ADMINISTRATOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42726. Filed May 31, 1956.

410

*Charles W. Bell, Esq.*, *Clarence E. Kendall, Esq.*, and *Clyde L. Wilson, Jr., Esq.*, for the petitioner.

*Richard W. Janes, Esq.*, and *Godfrey L. Munter, Jr., Esq.*, for the respondent.

412

## OPINION.

BLACK, *Judge:* For both 1946 and 1947, respondent determined that informal dividends, totaling $72,926.19 and $45,165.36, respectively, were received by the community of Frank and Helene from the Crosby Companies and that Helene did not report her community half thereof. We have set out the components of the above sums in our findings. Analysis of those components indicates that they can be segregated into three groups:

1. Moneys which Frank withdrew from the companies, retained from sales of their assets, or caused them to expend, primarily for his

benefit (Frank causing the companies to charge off his withdrawals and their expenditures as corporate-expenses).

2. Moneys which Frank caused the companies to expend for the benefit of Helene alone, or of both Helene and Frank, and to charge off as corporate expenses.

3. "Kickbacks" received by Frank from suppliers of the companies. This is a small item, being $1,630 for 1946 and none for 1947.

Petitioner argues that the above sums were embezzled by Frank from the companies, do not constitute income to him under section 22 (a) of the 1939 Code, *Commissioner* v. *Wilcox*, 327 U. S. 404, and *J. J. Dix, Inc.* v. *Commissioner*, (C. A. 2) 223 F. 2d 436, certiorari denied 350 U. S. 894, and therefore cannot be community income taxable one-half to Helene. Petitioner also argues that even if those sums do constitute income to Frank under section 22 (a), they were wrongfully acquired from the companies, thereby becoming impressed with a constructive trust, and that property so impressed does not become community property under Texas law. We are unable to sustain petitioner's position.

We note first that although Helene was the sole stockholder of the companies and that stock was her separate property, any dividend income therefrom in 1946 and 1947 would be community income of Helene and Frank. *Mellie Esperson Stewart*, 35 B. T. A. 406, affd. (C. A. 5) 95 F. 2d 821; *W. T. Carter, Jr.*, 36 B. T. A. 853, and cases cited therein. "The applicable Texas statutes vest title to the community property in the husband and wife in equal parts, but, during coverture, the husband has the exclusive power of control over the property as long as he discharges his obligation as the head of the family." *Herder* v. *Helvering*, (C. A., D. C.) 106 F. 2d 153, 155, certiorari denied 308 U. S. 17. Frank was the head of the family in the taxable years before us. There seems to be no doubt of that fact and petitioner does not dispute it. He, therefore, had complete control over any dividend income that might be realized from the Crosby Companies in 1946 and 1947 and could expend such income for any purpose he saw fit, even purposes redounding solely to his benefit such, for example, as paying his gambling debts.

Moreover, Frank was a director and the vice president and general manager of the companies and was in complete control of their operations. He also held a power of attorney from Helene who, although president and a director of the companies, performed no functions as president and took no active part in the businesses. The third director of the companies was an employee whom Frank had hired.

Finally, it is noted that the companies had sufficient earnings and profits to constitute as dividends all of the sums here in issue, had formal declarations of dividends been made.

Considering all of the above factors, we find the reality of the situation to be that Frank, as a practical matter, could have had the companies make formal dividend declarations and payments of the sums in issue and then, since such dividends would be community property subject to his exclusive control, expend them for any purposes he wished, nefarious though such purposes may have been. In such case there would be no doubt that those dividends constituted community income under Texas law, one-half of which was taxable to Helene. We do not believe that a different tax result should proceed simply from a change in the form of the transaction wherein Frank exercised dominion over the companies' earnings and profits without there first being a formal dividend declaration.

We think the situation here is somewhat akin to that in *Kann* v. *Commissioner*, (C. A. 3) 210 F. 2d 247, affirming 18 T. C. 1032, certiorari denied 347 U. S. 967, wherein the Court of Appeals made the following observation:

It is thus readily apparent that but for the alleged embezzlements 90% of the money in question (less corporate taxes) would in the normal course of events have been returned to the family in the form of dividends or capital. Unlike the situation in Wilcox, where the taxpayer would not have received the proceeds except for his conversion, the Kanns were to a large extent taking their own money. Indeed, under the Pennsylvania and Ohio codes, * * * and bearing in mind the principles of corporate entity, it would seem to be possible for the proprietor of a one-man corporation to be guilty of embezzlement if he diverted corporate monies to his own pocket without the formality of declaring dividends. Such local law concept of embezzlement, while it may be useful to deter those in control of a corporation from defrauding creditors and minority stockholders, should not, in our opinion, be used as a vehicle for tax avoidance, absent a clear mandate to the contrary.

See also *United Mercantile Agencies, Inc.*, 23 T. C. 1105, 1113. Here, too, but for the alleged embezzlements, the money in question (less corporate taxes) would in the normal course of events have been returned to Helene in the form of dividends or capital, as the court said in the *Kann* case, *supra*. If returned as dividends they would have been community income that Frank, as manager of the community, could have expended as he wished. Indeed it appears that one of the major reasons Frank used the methods he did to get the benefit of the companies' funds for himself and Helene was to minimize taxes. *Kann* v. *Commissioner*, *supra*.

Certainly the moneys which Frank caused the companies to expend for the benefit of Helene alone, or of both Helene and Frank, must, under our previous decisions, be regarded as income attributable at least in part to Helene even though there were no formal dividend declarations. *United Mercantile Agencies, Inc.*, *supra*. And, in view of the community nature of any income derived from the companies' and Frank's rights of disposition in regard thereto, we are

unable to make any distinction for tax purposes in regard to the earnings and profits which Frank appropriated solely for his own benefit and without formal dividend declarations. Such sums must also be held community income.

Petitioner relies on *Commissioner* v. *Wilcox, supra,* and *J. J. Dix, Inc.* v. *Commissioner, supra,* for its contention that the informal dividends here in issue were embezzled by Frank and therefore do not constitute income either to him or to the community. In any event those cases would not be applicable to the "kickbacks" received by Frank from the companies' suppliers, since it was held in *United States* v. *Bruswitz,* (C. A. 2) 219 F. 2d 59, certiorari denied 349 U. S. 912, that "kickbacks" are taxable to the recipient and do not fall within the *Wilcox* doctrine of nontaxability of embezzled income.

Further, the *Wilcox* doctrine is a narrow one [3] and has been applied only to clear-cut cases of embezzlement such as was found in *J. J. Dix, Inc.* v. *Commissioner, supra.* See *Rutkin* v. *United States,* 343 U. S. 130; *United States* v. *Bruswitz, supra; Kann* v. *Commissioner, supra; Marienfeld* v. *United States,* (C. A. 8) 214 F. 2d 632, certiorari denied 348 U. S. 865. It does not, we think, apply to the companies' funds expended for the benefit of Helene alone or of Helene and Frank jointly in view of the fact that Helene was sole stockholder of the companies. And, as regards the companies' funds appropriated solely for Frank's benefit, here again, when we consider Frank's complete control over the companies' affairs, the fact that the form actually employed by him to get the funds from the companies might "have technically amounted to embezzlement" under the local law is not determinative for Federal tax purposes. Indeed, we note that even though Helene caused the companies to bring suits against Frank in 1949 for misappropriation of property, no action was taken to criminally prosecute him for embezzlement. See *Kann* v. *Commissioner, supra.*

Petitioner's alternative argument, that in any event, the funds appropriated by Frank from the companies were impressed with a constructive trust and therefore do not constitute community income, must also, we think, fail. It seems to be well established that a constructive trust is a legal fiction, remedial in nature, developed to prevent unjust enrichment. Trusts, sec. 139, 89 C. J. S. 1015. We note that the Crosby Companies were solvent at all times here material. It would therefore appear that none of the sums in issue could be said to be impressed with a constructive trust in favor of the creditors of the companies and, in fact, petitioner does not contend such

---

[3] "* * * no single, conclusive criterion has yet been found to determine in all situations what is a sufficient gain to support the imposition of an income tax. No more can be said in general than that all relevant facts and circumstances must be considered. * * *" *Commissioner* v. *Wilcox,* 327 U. S. 404.

to be the case. Petitioner does argue though that the appropriated sums were impressed with a constructive trust in favor of the companies and their stockholders. In view, however, of the fact that Frank was the directing head of all three of the companies and was in complete charge of their affairs and was placed in that position by the will of the stockholders, we do not believe that the doctrine of constructive trust is applicable. Frank's misappropriation was in essence a misappropriation of the community funds and petitioner has referred us to no case in which a husband, during coverture and while head of the family, has been declared constructive trustee of community funds.

We sustain respondent in his determination that unreported informal dividends of $72,926.19 in 1946 and $45,165.36 in 1947 were received by the community of Helene and Frank and that one-half thereof constitutes income taxable to Helene.

The next issue we have to decide is respondent's adjustment increasing 1947 net community income by $109,304.43 for "Withdrawals." This was composed of personal expenses paid by the companies for Helene and Frank, or money advanced to them, and charged against them as accounts receivable on the companies' books. We have found that the net charges actually made for 1947 totaled $109,264.43, of which $42,013.92 was charged against accounts receivable in Helene's name and $67,250.51 was charged against accounts receivable in Frank's name.

Whether or not the withdrawals represented community income to Helene and Frank in 1947 "depends upon * * * [the recipient's] intent and whether he [or she] took the company's money for permanent use in lieu of dividends or whether he [or she] was *then* only borrowing." (Emphasis supplied.) *Carl L. White*, 17 T. C. 1562, 1568. It is the intent at the time the withdrawals were made which is determinative. If, at that time, the recipient intended the withdrawal to be a loan which he would repay but, in a later year, changed his mind, the withdrawal still qualifies as a loan in the year made and does not become income until such later year. *Wiese* v. *Commissioner*, (C. A. 8) 93 F. 2d 921, certiorari denied 304 U. S. 562.

The question of Helene's and Frank's intent at the time of their withdrawals in 1947 is one of fact which we must decide upon consideration of all the circumstances present in this particular case. *Al Goodman, Inc.*, 23 T. C. 288; *Victor Shaken*, 21 T. C. 785. We have carefully reviewed the entire record and have concluded that at the time of their respective withdrawals in 1947, and during all of that year, both Helene and Frank intended them to be loans from the companies which they would repay.

For many years Helene followed the practice of withdrawing sums from the companies and, in effect, repaying the companies by charging those withdrawals against her credit balances with them which she had inherited from her first husband. The companies, in fact, owed her money in every year, save one, from 1938 through 1945, and at the end of 1946 she and the companies were even. The sums totaling $42,013.92 which she withdrew from the companies during 1947 were charged to her on their books. She further recognized those withdrawals as loans by executing, in 1948, a 2 per cent demand note covering them, and she subsequently made every effort to repay them. Moreover, at the time Helene made the withdrawals in 1947 she was a wealthy woman capable of repaying them at any time. .

Her efforts to repay the companies in 1949 by transfer of a ring to them, and sale to one of the companies of stock in another, has been challenged by respondent as a paper transaction. Ordinarily such circumstances might raise serious doubts in our mind regarding Helene's bona fide intent at the time the withdrawals were made, but here those circumstances are explained to our satisfaction by the fact that Helene's cash position was poor because Frank had taken much money from her bank accounts. All things considered, therefore, we are of the opinion that Helene at all times intended her 1947 withdrawals from the companies to be loans which she would repay.

As regards the $67,250.51 in withdrawals by Frank during 1947, it is first noted that $16,650.28 thereof was obviously for Helene's benefit because such amount was, by adjusting entries, transferred to Helene's account in January 1948, treated by her as a debt, and subsequently repaid. We think it clear, therefore, that this sum was not income to Frank.

The question of Frank's intent regarding the $50,600.23 balance of his 1947 withdrawals is a closer one. Those withdrawals were charged to Frank on the books of the companies at the time made and were, in part, further recognized by Frank in 1948 by his execution of a 2 per cent demand note covering most of that balance. Later in 1948, the companies charged off the $50,600.23 balance, including that part covered by the note, as a bad debt. Subsequently, in the stipulated judgments arrived at between Frank and the companies in 1952, the $50,600.23 was recognized by him as a debt owed to the companies and was paid by him. After careful study of the above facts, we conclude that at the time Frank withdrew the $50,600.23 in 1947 and during the remainder of that year, he intended those withdrawals to be loans which he would repay. They were in fact subsequently repaid. We hold these withdrawals were loans, and not dividends.

In 1946, Frank caused one of the companies to exercise an option held by William C. Schmitz, a geologist, to purchase an oil and gas

lease covering 286 acres from the Clifton Land Corporation for $30,-000 plus a $5/16$ royalty. The company gave Schmitz a $1/16$ overriding royalty interest in the lease and Schmitz then gave Frank personally a $1/48$ interest therein. Respondent determined that the fair market value of Frank's interest at the time he received it was $7,174.50 and included it in the community income of Frank and Helene at that value. The $1/48$ interest Frank received from Schmitz must be included in community income at its fair market value. Regs. 111, sec. 29.22 (a)–3. Respondent's determination of fair market value is prima facie correct and petitioner bears the burden of proving the incorrectness of that determination. *Walls* v. *Commissioner*, (C. A. 10) 60 F. 2d 347. Petitioner, in its brief, contends that this $1/48$ interest which Frank received from Schmitz had a fair market value not in excess of $500. Respondent argues that his determination of $7,174.50 value should be sustained. There is testimony in the record concerning the fair market value of this $1/48$ overriding royalty interest. After giving consideration to this testimony we have found that Frank's $1/48$ overriding royalty interest in the Clifton Land property lease had a fair market value of $3,500 at the time Frank received it.

Also, another item which respondent included in the community income was a $1/72$ overriding royalty interest in the Pine Prairie lease which Frank received from Schmitz for his help in securing a sublease to a third party who intended to conduct a drilling operation on the land. Petitioner contends that at the time Frank received this interest from Schmitz, the value of the lease was so highly speculative that it was practically worthless and had no fair market value. We are not convinced that this is true. Respondent, in his determination of the deficiency for 1946, has determined this $1/72$ overriding royalty interest in the Pine Prairie lease to have had a fair market value at the time it was received of $1,019.78. We think from the evidence this value is too high. In our Findings of Fact we have fixed the value of this $1/72$ overriding royalty interest at $500 at the time Frank received it from Schmitz.

The result of our holding as to the two oil royalty properties is to hold that item (c) in the Commissioner's adjustment for the year 1946 "Oil properties acquired $8,194.28," should be $4,000, instead of $8,194.28 as the Commissioner has determined. That figure will be used in a Rule 50 computation.

Respondent determined that $30,798.56 in unidentified bank deposits represented unreported community income to Helene and Frank in 1946. This was composed of $10,822.27 in deposits to Helene's individual bank accounts, and $19,976.29 in deposits to Frank's individual bank accounts. We have found, however, that $15,000 of the deposits to Frank's bank accounts was received by Frank in settlement of a

lawsuit arising out of matters in which he was interested before his marriage to Helene. That $15,000 was Frank's separate property and not income to the community. Tex. Civ. Stat. (Vernon) art. 4613; *Sauvage* v. *Wauhop*, 143 S. W. 259 (Tex. Civ. App.); *Welder* v. *Lambert*, 44 S. W. 281 (Tex. Civ. App.); *Cabell* v. *Menczer*, 35 S. W. 206 (Tex. Civ. App.).

The balance of the unidentified bank deposits, totaling $15,798.56, represented unreported community income of Frank and Helene. Respondent's agent made a thorough study of Helene's and Frank's bank accounts. As stated in respondent's brief, his agent "went to the banks and made transcripts of the bank accounts of both individuals. * * * He examined *all* the deposit slips and made copies of them. He examined *all* of the [Crosby] Corporations' checks, the bank cancellation dates, and identified such corporate items on the individual bank accounts. He traced all other known income items into the known bank accounts and traced all transfers between known bank accounts." The results of the agent's investigation were introduced in evidence. Moreover, the record reveals that at least two probable sources of those unexplained deposits were property owned by Helene (our findings indicate she maintained a separate bank account for some such property) and Frank's gambling activities.

Petitioner, on the other hand, has completely failed to give any explanation for the $15,798.56 in unidentified deposits. It has, therefore, not sustained its burden of proving respondent's determination to be incorrect as regards this amount. Consequently, we hold that the $15,798.56 constituted unreported community income of Frank and Helene for 1946.

### *Fraud Issue.*

It is well settled that respondent has the burden of proving fraud by clear and convincing evidence. In our opinion, he has here failed to sustain that burden.

It should be remembered that we do not have Frank's case before us. The fact that he may have been guilty of fraud in many of his transactions with the companies and in his income tax returns does not mean that fraud penalties should be sustained against Helene. No joint returns were filed in 1946 and 1947 by the two. Helene filed her own separate returns for those years, and so did Frank. Unless the respondent has shown that Frank and Helene were acting in concert in Frank's defalcations, he has failed to prove his case against Helene insofar as the fraud penalties are concerned. Petitioner's evidence, it seems to us, clearly shows Helene's disassociation from the acts in question, her ignorance of these acts at the time committed, and her zealous repudiation of those acts at the time she learned of them. Helene was in ill health before, during, and after the years involved.

Her paramount interest was in the recovery of her health. To this end she turned over all her business affairs to her husband for management. The evidence convinces us that she was not a party to his fraudulent transactions. The evidence convinces us that during the 2 taxable years here involved she had implicit confidence in Frank. Later on and prior to her death she was to find that confidence had been greatly misplaced.

After a careful examination and weighing of all the evidence, we have made a finding that "No part of the deficiencies in Helene's income taxes for 1946 and 1947 was due to fraud with intent to evade tax." That finding disposes of the fraud issue in favor of petitioner. The imposition of fraud penalties by the Commissioner is not sustained.

*Decision will be entered under Rule 50.*