William D. Bryan v. Commissioner. Gertrude A. Bryan v. Commissioner.
Bryan v. Commissioner
Docket Nos. 49533, 49534.
United States Tax Court
T.C. Memo 1957-180; 1957 Tax Ct. Memo LEXIS 70; 16 T.C.M. (CCH) 802; T.C.M. (RIA) 57180; September 24, 1957
*70 An amount of $220,000 withdrawn from a corporation by the sole stockholder, held on the facts to be a loan and not a dividend. An unauthorized and erroneous credit of $25,740 to the account of the sole stockholder on the books of another corporation held not to be a dividend. Charles F. Osborn, Esq., for the petitioners. Wilford H. Payne, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax and additions thereto in identical amounts as to each petitioner for the calendar years 1944, 1945 and 1946 as follows: Additions
Section
Section
Year
Deficiency
Section 291(a)
Section 293(b)
294(d)(1)(A)
294(d)(2)
1944
$75,658.69
$18,399.42
$37,829.34
$7,359.77
$4,415.86
1945
5,432.50
377.85
151.14
90.68
1946
4,510.25
488.05
195.22
117.13
*71 The pleadings do not raise any issues with respect to the deficiencies in tax for the years 1945 and 1946. Issues were raised by the pleadings as to the additions to tax for each year, but such issues are removed from our consideration by written stipulations that for the year 1944 the petitioners are not liable for 50 percent additions provided for by section 293(b) of the Internal Revenue Code of 1939, but that they are liable for all the years 1944, 1945 and 1946 for additions under section 291(a) (for failure to file returns), under section 294(d)(1)(A) (for failure to file declarations of estimated tax), and under section 294(d)(2) (for substantial underestimates of estimated tax). There remain for our consideration two questions, both of which pertain to only the deficiencies in income tax determined by the respondent in the case of each petitioner for the calendar year 1944. One is whether the sum of $220,000 received by the petitioner William D. Bryan from United Union Breweries Company as a purported loan was in reality a dividend to the extent of available earnings. The other is whether the sum of $25,740 credited to Bryan's account by Pioneer Distributing Company (formerly *72 Mutual Brewing Company, Inc.) as a dividend was actually a dividend to the extent of available earnings. Findings of Fact General Facts Stipulated facts contained in a written stipulation are incorporated herein by this reference. The petitioners are members of a marital community under the laws of the State of Washington. William D. Bryan will herein be referred to as the petitioner. The petitioner's formal education stopped after two months of high school. He became a hard rock miner at 16 years of age, and later became a truck driver delivering beer. His first stock interest in a brewery was acquired on December 31, 1941, when he became the owner of some stock in the Mutual Brewing Company, Inc., (herein sometimes called Mutual or Mutual Brewing) [1] at Ellensburg, Washington. At that time he was an employee of Mutual. He acquired his stock interest from Williams Brothers, a partnership engaged in a beer distributing business. In 1943 he had a one-third stock interest in Mutual and was its president. The other stockholders were Joe K. Hart and Clarence J. Coleman, each of whom owned one-third of the stock. *73 Facts Concerning the United Union Breweries Company Transactions In October of 1943 the petitioner and Joe K. Hart learned that the stock of United Union Breweries Company was for sale. [2] That company (herein sometimes called Union or Union Brewing) was a Washington corporation with principal place of business at Walla Walla. At that time a large eastern corporation was engaged in carrying on a secret project for the armed services of the United States at Hanford in the desert wasteland of Washington. One of the difficulties being experienced in carrying out the project was to get a sufficient supply of beer for the employees. Beer was being supplied to the project by Mutual Brewing but the quantity was insufficient for its needs. The procurement agent had not been able to secure beer from Union Brewing and he advised the petitioner of the fact that stock of Union was for sale. The stock was then owned by interests in Cincinnati, Ohio. Officials of the Hanford project encouraged the petitioner to acquire control of Union Brewing. With their assistance he met with the Cincinnati interests and negotiated for the purchase of the stock of Union Brewing and made a down payment of *74 $10,000 which he had borrowed. The stock of Union Brewing consisted of 3,000 shares. All of it was acquired in November 1943, at a cost of $220,000. One certificate for the 3,000 shares was issued in the name of the petitioner. One-third of the 3,000 shares became the property of the petitioner, and the other two-thirds became the property of Joe K. Hart at the time of the purchase. The purchase price of $220,000 was raised by obtaining a loan of $110,000 from the First National Bank at Everett, Washington (herein called the Everett bank), $10,000 was borrowed by the petitioner from Mutual Brewing, and $100,000 was advanced by Joe K. Hart. The bank loan was evidenced by two notes, one from Union in the amount of $75,000 and one from Mutual in the amount of $35,000 and was guaranteed by Hart. It was secured by the 3,000 shares of Union Brewing stock, the certificate for which was endorsed by the petitioner and delivered to the bank, and was further secured by a $75,000 mortgage on the physical assets of Union and a $35,000 mortgage on the physical assets of Mutual. On November 22, 1943, the *75 petitioner was elected president of Union Brewing and C. G. Uran and J. A. Norway became secretary and treasurer, respectively. Uran and Norway were officials of the Everett bank. The petitioner, Uran and Norway became directors of Union. On December 9, 1943, Union entered into an agreement with the Williams Brothers partnership to sell to it not less than 20,000 barrels of beer during the calendar year 1944. The contract contained a $25,000 liquidated damages provision in the event of breach by Union Brewing. The Williams Brothers partnership was composed of Howard J. and Elmer G. Williams, who were brothers. It was a distributor for Mutual, and Union wanted the partnership as its distributor in Tacoma. Williams Brothers agreed to loan Union the sum of $50,000 for use in purchasing inventory. By August 1944 differences of opinion between the petitioner and Joe K. Hart as to the operation of Union and sale of its product had become acute. The petitioner, at the insistence of Hart, resigned as president of Union about August 1, 1944. William T. Hart, a brother of Joe K. Hart, was elected president and director in place of the petitioner. One of the Harts notified Williams Brothers *76 that the contract of December 9, 1943, between Union and Williams Brothers would be cancelled and that the $25,000 provided for therein as liquidated damages would be paid. Williams Brothers did not want the contract to be cancelled. Beer was in short supply and Williams Brothers wanted to continue to receive their quota from Union for its customers. Accordingly, upon the urging of Howard Williams, the petitioner on August 4, 1944, secured from Joe K. Hart an option to purchase Hart's two-thirds of the stock of Union and his one-half of the stock of Mutual. On the signing of the option the petitioner paid Hart $25,000, which sum had been advanced by Williams for that purpose, and which was to be credited against the purchase price of the stocks. The purchase price of Hart's stock in Union was $146,666.66 and the purchase price of his stock in Mutual was $75,000. In addition to the petitioner's agreement to pay those sums, the option agreement provided that the petitioner was to pay to the Everett bank the sum of $73,333.34 then outstanding on the 1943 loan and for which the Union stock was pledged as security, and also to pay off a $30,000 note of the petitioner and Hart then held *77 by Coleman, which had been given in connection with the acquisition of Coleman's one-third stock interest in Mutual. The option was exercised on August 11, 1944. The total amount of $325,000 for which the petitioner was obligated was paid. [3] It was raised by Williams Brothers' loaning to the petitioner $220,000 and by Mutual's advancing to the petitioner $105,000. Upon the exercise of the option the stock certificate for all of the 3,000 shares of Union stock was delivered by the Everett bank to Williams Brothers as pledgee for the purpose of securing their loan of $220,000 to the petitioner. The common and preferred stock of Mutual, which was then all owned by the petitioner, was also pledged with Williams Brothers to secure in part their loan to the petitioner. The petitioner did not give to Williams Brothers any note or letter to evidence his obligation to that firm. On August 11, 1944, the petitioner was elected president of Union and Howard J. Williams was *78 elected secretary and treasurer. They, together with Elmer G. Williams, became the directors of the company. At the same time, and at the direction of Williams Brothers, Delbert E. Lane was employed as general manager of Union and was authorized to sign all checks and state and Federal reports on behalf of Union. H. A. Andrews was employed as production manager. Lane and Andrews made their reports on the operation of Union to Howard J. Williams, as well as to the petitioner. Between August 11, 1944 and July 20, 1945, the petitioner did not have authority to sign checks drawn on, or to make withdrawals from, any bank account of Union, except that in the latter part of 1944 the directors of Union authorized the petitioner to borrow sums on behalf of the corporation up to $100,000 from a specified bank. On December 11, 1944, the directors of Union, in order to protect Williams Brothers in connection with a loan to be secured from that partnership, authorized the purchase of $100,000 insurance on the life of the petitioner, the insurance to be payable to Union and the premiums to be paid by it. Such a policy was purchased. Banks which financed Williams Brothers did not regard with *79 favor any connection betwen that firm and the brewing business either by way of stock ownership or indebtedness. Accordingly, Williams Brothers, in December 1944, demanded that the petitioner satisfy his $220,000 indebtedness to the partnership. To accomplish this, Union, at the direction of Howard Williams, issued its check on December 18, 1944, to the order of the petitioner in the amount of $220,000. The check was endorsed by the petitioner, was delivered to Williams Brothers, and was cashed in December 1944. There were no corporate minutes or record authorizing the payment of $220,000 to the petitioner. On the same date that Union issued its check to the petitioner, December 18, 1944, the petitioner executed a promissory demand note payable to the order of Union in the amount of $220,000 with interest at the rate of 4 percent. The note was given by the petitioner at the request of Delbert E. Lane, the general manager of Union. The amount of the check, $220,000, was charged to the petitioner's running account on the books of Union. At the time that Union issued its check for $220,000 it did not have that amount on deposit in its bank account. In order to cover the amount of the *80 check, Williams Brothers on December 22, 1944, loaned Union the sum of $100,000 at 4 percent interest. In return for that loan it received a 10-year contract as Union's exclusive sales agent commencing January 1, 1945. Williams Brothers continued to hold the stocks of Union and Mutual as security for the loan of $100,000 to Union. The petitioner intended to and thought that he could repay Union the amount of $220,000. In December 1944, he considered the financial prospects of Union to be very good. There was a beer shortage and the company could sell all that it could produce, without advertising or selling expenses. The prospects then were that there would be a continued demand for an indefinite period. While grain was rationed, Union was using materials that were free of quota. It was able to increase its production from 67,000 barrels of beer in 1944 to 94,000 in 1945, and 150,000 in 1946. In September 1945, a plan was conceived by the petitioner to form a "partnership" of distributors to raise an amount of $200,000 for the purpose of enabling him to pay his debt to Union. A proposed agreement was drawn, the parties to which were distributors, the corporation, Williams Brothers, *81 and the petitioner. The draft of the agreement recited that the petitioner owed Union in excess of $200,000, and it was provided that the "partners" (who were the distributors) would raise $200,000 and loan that sum to the petitioner for a term not to exceed ten years upon the condition that he would apply that amount on his debt to Union. It was contemplated that the petitioner's stock in Union would be pledged as security. No interest would be charged, but all dividends on the stock would be applied toward repayment of the $200,000 to the partners. The partners were to obtain the beer output of Union and distribute it. This plan progressed to the point where several of the partners had accepted it and the sum of $200,000, or a substantial part thereof, had been raised. However, the Alcohol Tax Unit would not approve the plan and it was abandoned, the money being refunded to the partners who had advanced it. The petitioner also interviewed several brewers in an attempt to sell stock, but without success. He also sought and received the financial advice of the comptroller and auditor of the Everett bank who in a letter dated December 22, 1945, set forth several proposed plans under *82 which the petitioner might raise money and pay his debts to Union and Mutual. In that letter reference is made to the petitioner's debt to Union in the amount of $240,000. In February 1947, the petiioner in reply to a request from a certified public accountant made in connection with an audit of Union's books acknowledged in writing that he was indebted to Union at December 31, 1946, on a note in the amount of $226,442.92. In 1944 Union had profits in the amount of $163,366.45. From the time of incorporation on February 16, 1937 to December 31, 1943, it had a total operating loss in the amount of $636,934.74. Its net profits or losses for the years 1945 through 1951, as adjusted in some instances by the Internal Revenue Service and agreed to by the company, were as follows: Income
Adjusted Net
Tax Paid
Income Before
as Finally
Loss Carry-Back
Adjusted
1945
$174,541.84
$28,581.77
1946
155,486.14
9,679.73
1947
(92,391.56)
None
1948
(122,907.78)
None
1949
* (45,160.78)
None
1950
* (24,717.73)
None
1951
* (64,690.58)
None
In 1946 and 1947 Union encountered operating difficulties. Due to the fact that *83 a foreign substance got into one of the ingredients, the beer went "wild," that is, air formed in the bottled beer and it would gush out of the bottles. The result was that Union had to take back about $60,000 worth of beer. Subsequently governmental controls on grain were lifted so that other brewers were able to increase their output, and some of Union's distributors went over to competitors. About that time the management of the Hanford project was changed and the new management refused to take Union's beer. In the spring of 1947 Union was in serious financial difficulties and was unable to meet its obligations. Operations for the manufacture of beer ceased at that time and, except for a short period in 1949, Union has been inactive ever since. In April 1947 the directors of Union authorized the transfer of certain real property valued at $38,000 to Williams Brothers to be applied in reduction of the $100,000 loan made in 1944. On May 14, 1947, the petitioner resigned as president and director of Union. He was succeeded by H. A. Andrews as president and director. The petitioner's resignation was effected at the request of Howard J. Williams who thought that Andrews could probably *84 liquidate some of Union's properties better than the petitioner, and that having Andrews in charge might prevent creditors from closing in. On July 2, 1948, the directors of Union (being the two Williams brothers and H. A. Andrews) met with the petitioner at a special meeting at which Williams Brothers agreed to accept $50,000 in satisfaction of the balance then outstanding on Union's note which was then in the amount of $62,000. It was also agreed at that meeting that the inventory and personal property of Union should be sold as quickly as possible, but that such sales were not to injure the brewery as a going concern without the consent of the petitioner. Union paid the agreed sum of $50,000 to Williams Brothers by December 30, 1948, at which time the one stock certificate representing all the stock of Union was returned to the petitioner. The petitioner was then elected president and a director of Union, and two other individuals were elected directors in place of the Williams brothers who had resigned. The running account of the petitioner on the books of Union, to which his $220,000 note was charged on December 18, 1944, fluctuated from time to time as charges were made for *85 withdrawals and payments of personal expenses, and as credits were made for deposits of salary checks and various other items. No credits were ever shown on this account, prior to August 1, 1951, as credits to principal or interest on the $220,000 note. The year-end debit balances of the petitioner's account with Union for the years 1944 to 1951, inclusive, were as follows: December 31, 1943
$ 84,068.62
December 31, 1944
128,005.33 [4]
December 31, 1945
234,679.40
December 31, 1946
229,200.22
December 31, 1947
225,090.44
December 31, 1948
223,365.44
December 31, 1949
220,984.86
July 27, 1950
220,184.86
August 1, 1951
184.86
On August 1, 1951, the petitioner transferred his 3,000 shares of stock of Union Brewing to that corporation and the note of December 18, 1944, in the amount of $220,000 was thereupon shown for record purposes as being cancelled. At the same time the petitioner subscribed for, and there was issued to him, *86 10 shares of stock of Union for $73.33 per share, and he was also granted an option to purchase the remaining 2,990 shares of stock at a price to be fixed by the board of directors. The petitioner signed all Federal income and excess profits tax returns of Union for the years 1944 through 1951 with the exception of the year 1947. He signed the returns as president, and in the appropriate places provided therefor he was shown as the owner of all of the stock. The petitioner was never authorized to sign for Union applications for Federal or state alcohol permits. The $220,000 which the petitioner withdrew from Union by check dated December 18, 1944, was determined by the respondent to be a dividend to the extent of Union's earnings and profits for the year 1944 in the amount of $163,366.45, and one-half of that amount was included by him in taxable income of each of the petitioners. Ultimate Finding The amount of $220,000 withdrawn by the petitioner from Union Brewing by check dated December 18, 1944, was intended to be, and constituted, a loan from Union Brewing to the petitioner, and no part of that amount constituted a dividend. Facts Concerning the Mutual Brewing Company, *87 Inc. Transaction In 1943 the petitioner owned one-third of the stock of Mutual Brewing. The other stockholders were Joe K. Hart and Clarence J. Coleman, each of whom owned one-third of the stock. In 1944, prior to August 4, the petitioner and Hart acquired Coleman's one-third of the stock in equal shares. Upon exercise of the option agreement between the petitioner and Hart dated August 4, 1944 (hereinbefore described in the Union Brewing transaction), the petitioner became the owner of all of the stock of Mutual Brewing. He continued to own all of the stock throughout the remainder of the year 1944 and during the year 1945. The petitioner had a drawing account with Mutual Brewing to which numerous debit and credit entries were made during the years 1943 through 1948. The following is a summary of the year-end balances of indebtedness shown in such account as owing by petitioner to Mutual: December 31, 1943
$ 61,190.37
December 31, 1944
104,450.37
December 31, 1945
129,448.27
December 31, 1946
134,350.02
December 31, 1947
120,643.81
June 30, 1948
121,143.81 The balance of $104,450.37 set forth above as of the end of 1944 was the debit balance after crediting *88 to the account the amount of $25,740 as a dividend on preferred stock as of December 1944. During the year 1944 the petitioner discussed the matter of his indebtedness to Mutual with the comptroller and auditor of the Everett bank, who suggested that petitioner's indebtedness to Mutual could be reduced by means of a dividend on the preferred stock, all of which was owned by the petitioner. During the year 1944 the petitioner did not discuss the matter of a possible dividend on his Mutual stock with the other directors, who were the Williams brothers. The matter of a possible dividend by Mutual was not discussed at any directors' meeting in December 1944. Two meetings of directors were held in December 1944 at which other matters were discussed, and as to which the action of the directors was duly recorded in signed minutes which were filed in the corporate minute book. In February or March 1945, the comptroller and auditor of the Everett bank who prepared Mutual's income tax return for 1944, in preparation for the making up of such return, made closing entries on the books of Mutual for 1944. Among such entries were journal entries made as of December 22, 1944, purporting to *89 show the payment of a $25,740 dividend on the preferred stock, reading as follows: Profit and Loss
$25,740
Dividends Declared
$25,740
6 yr. 6% dividend declared on 715
shrs. Preferred stock held by stock-
holders. For period 10-6-37 to 10-6-43.
Dividends Declared
25,740
W. D. Bryan
25,740
1944 Dividend paid on Preferred stock
credited to stockholders acct.
Some time in 1945 either the comptroller and auditor of the Everett bank or Mutual's bookkeeper prepared and typed what purported to be minutes of a special meeting of the directors of Mutual held on December 22, 1944, stating that a dividend of 6 percent per year for the 6 years ending October 5, 1943, a total of $36 per share, was declared. The typed page, unsigned, was inserted in the minute book of the corporation. No such meeting was ever held. The petitioner was not aware of any record of a dividend on his Mutual stock until June 1945 when the entry above referred to was called to his attention by a certified public accountant during an audit of Mutual's books. The petitioner thereupon directed a reversal of the entry, and on September 30, 1945, the bookkeeping entries recording a *90 dividend on Mutual's preferred stock were reversed on the books of Mutual, and the petitioner's drawing account was again charged with the amount of $25,740. The earnings and profits of Mutual for the taxable year 1944 were in the amount of $22,531.78. On its income tax return for the year 1944 Mutual reported a deficit of $20,023.08 as of December 31, 1944, after a total distribution to stockholders in cash, charged to surplus, in the amount of $25,740. The petitioner signed Mutual's 1944 income tax return as president. He was not aware of the statement contained in the return which showed a distribution to stockholders. The petitioners did not report in their income tax return for 1944 the receipt of any amount as a dividend from Mutual. The respondent included in taxable income of each of the petitioners for the year 1944 one-half of the amount of $22,531.78 as a dividend from Mutual Brewing. Ultimate Finding The amount of $25,740 which was credited to the petitioner's account on the books of Mutual Brewing as of December 22, 1944, was a bookkeeping error, and no part of that amount constituted a dividend. Opinion The Union Brewing Transaction In December 1944, *91 the petitioner received a check from Union Brewing in the amount of $220,000, under circumstances fully described in the Findings of Fact. The respondent has treated that sum as a taxable dividend to the extent of $163,366.45, the amount of available earnings of the corporation. The petitioner contends that the entire $220,000 was a loan and that no part of it is taxable as a dividend. The statute under which the respondent has treated a part of the $220,000 as a dividend is section 115(a) of the Internal Revenue Code of 1939 which defines a dividend as "any distribution made by a corporation to its shareholders * * * (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * *." There is no issue as to the amount. If there was a dividend at all, the amount thereof was the amount determined by the respondent. The question of whether the amount withdrawn by the petition from the corporation was a dividend or a loan to him is one of fact, to be determined from the surrounding facts and circumstances, and particularly with reference to the petitioner's intent at the time of the transaction. Victor Shaken, 21 T.C. 785, *92 Al Goodman, Inc., 23 T.C. 288. In the case of Harry E. Wiese, 35 B.T.A. 701, affd. (C.A. 8), 93 Fed. (2d) 921, certiorari denied 304 U.S. 562, rehearing denied 304 U.S. 589, where, as here, the taxpayer was the sole stockholder, the Court of Appeals said: "The significant fact in the present case was the intent of the petitioner when he took the money, whether he took it for permanent use in lieu of dividends or whether he was then only borrowing. [5]" *93 On the basis of all of the evidence we have concluded that at the time the petitioner received the check from Union Brewing on December 18, 1944, he intended that the amount was to be a loan which he would repay to the corporation. He so testified and a note in that amount was given to the corporation. Although the treatment of the $220,000 as a loan was not made the subject of formal minutes of the directors, the matter was fully discussed, including the giving of a note by the petitioner, among the three directors and with the attorney for the Williams Brothers partnership. It was, of course, to the advantage of Williams Brothers that the $220,000 constitute a loan rather than a dividend, in view of the fact that after the transaction Union owed Williams Brothers $100,000, as security for which it continued to hold the Union stock. Failure to record formal authorization of the note was, as we said in Irving T. Bush, 45 B.T.A. 609, 623[6] "evidence, at most, here of loose corporate procedure." The withdrawal of the lump sum of $220,000 was in excess of the available earnings and was occasioned *94 by a nonrecurring, emergency situation. Cf. Al Goodman, Inc., supra. Williams Brothers partnership to whom the petitioner owed $220,000 required that its loan be repaid before the end of the year 1944 and the petitioner had to comply. The partnership had practical control over Union, in view of the fact that they held its stock as security and controlled the board of directors, and it chartered the course for the petitioner to follow even to the extent of directing the general manager of the corporation, who was a Williams Brothers appointee, to write the check. All that was left for the petitioner to do was to endorse the check and deliver it to the partnership. The petitioner himself had no power to sign corporate checks. The fact that the petitioner executed a note to the corporation and the fact that the amount of the note was carried on the books as a note receivable cannot be ignored. Victor Shaken, supra. The petitioner testified that he intended to repay the $220,000 and that he believed that he would be able to repay it. This belief of the petitioner does not appear to be unreasonable in the light of the evidence as to the prospects of Union *95 at that time. The corporation was then operating at a profit. There was a beer shortage and it could sell all the beer that it could produce, without advertising or selling expenses. The prospects then were for continued demand for an indefinite period. It was able to use non-quota manufacturing material in lieu of grain which was rationed, and its production was increased quite substantially in 1945 and 1946 over the 1944 production. If Union continued to be successful financially the petitioner could have repaid the loan either with distributed earnings by the corporation or proceeds of sale of some of his stock. Subsequent conduct of the petitioner corroborates his claim that the amount withdrawn was intended as a loan and that he intended to repay it. As set forth in some detail in the Findings of Fact, efforts were made in 1945 to form a partnership of distributors to raise $200,000 as a loan to the petitioner in order that he might repay the corporation. Furthermore, the petitioner interviewed brewers in attempts to sell some of his stock and sought and obtained advice as to methods of repayment of the amount in question. The amount in question was carried on the books of *96 the corporation as a debit to the petitioner's running account. In the years immediately following 1944 there were both debits and credits to this account; the credits included petitioner's salary checks. While there were no specific credits in that account designated as payments of principal or interest on the $220,000 note, there having been current debit items against which the credits were applied, the petitioner's intention was that the credits should be applied against the note and he thought that they were so applied. Upon consideration of all of the evidence we have concluded that the petitioner and the other persons in interest, namely, the Williams brothers, intended that the sum of $220,000 withdrawn from Union Brewing should be repaid, and we have found as a fact that the withdrawal constituted a loan. We accordingly hold that the respondent erred in treating a part of the amount withdrawn as a dividend. There is no issue presented, as in Estate of Helene Simmons, 26 T.C. 409, as to the taxability, as dividends, of current drawings for petitioner's personal use that were charged to his running account. The Mutual Brewing Transaction The evidence establishes *97 that the credit of $25,740 to the account of the petitioner on the books of Mutual Brewing was wholly unauthorized. We recognize that in closely held corporations financial transactions are often carried out in an informal manner, and that a distribution from earnings may constitute a dividend even though there is no formal declaration. Gregg Co., Ltd., 25 B.T.A. 81, 89. But here there was a total lack of action, informal or otherwise, which would warrant the view that there had been any declaration of a dividend in 1944. While there had been discussions as to the possibility of the petitioner's reducing his indebtedness by means of the declaration of a dividend on the preferred stock, the evidence is clear that nothing was done beyond the discussion stage. No action was taken on the matter. The petitioner, when questioned as to what he did about the suggestion of the comptroller and auditor of the Everett bank that a dividend be declared, testified that "I forgot about it. I didn't do anything." There is also clear and uncontradicted testimony that the matter of a possible dividend was not discussed between the petitioner and the other two directors, and that it was *98 never considered at any directors' meetings. Although the petitioner owned all the stock, it was pledged as security for a loan owing to the Williams brothers, who were the other two directors, and it would seem probable that such other directors would have been consulted had the petitioner intended to have the corporation pay a dividend. Two meetings of the directors were held in December 1944, one on December 11th and another on December 30th, at which action was taken on other matters and which are covered by formal minutes in Mutual's minute book that was kept by its attorney. There is in the record a purported minute covering what is stated therein to be a record of a directors' meeting of December 22, 1944, at which a dividend on the preferred stock was declared. That purported minute is entirely different in form and manner of expression from the minutes regularly kept. A space is provided thereon for the signature of "Secretary," but it was never signed by anyone. The official minutes were customarily signed by the petitioner as president and Howard J. Williams as secretary. The petitioner's testimony, uncontradicted by anything in the record, in referring to the purported *99 meeting of December 22, is that "That meeting was never held." There is some question as to the exact origin of the purported minutes of a meeting on December 22. The comptroller and auditor of the Everett bank who, in February or March 1945, made the closing entries for Mutual for 1944, and who prepared its income tax return, testified that it was quite possible that he had typed up the minutes and sent them to be submitted on the assumption that a directors' meeting would be held and that such action would be taken. He stated that he understood that the matter of a dividend would be taken up and authorized, but that he never heard whether this transpired. The petitioner testified that the purported minutes may have been prepared by Mutual's bookkeeper some time after 1944. Whatever the origin of the paper, we are satisfied from the evidence that no meeting of directors was held on December 22 as is recited therein. More important is the fact, established by the record, that no dividend on Mutual's preferred stock was authorized in 1944, either formally or informally. The petitioner did not receive the amount of $25,740. Nor, as we construe the stipulation and the other evidence, *100 was the amount in question credited to the petitioner during the year 1944. Rather, the crediting entry was made in February or March 1945, and was reversed in that year. Although the petitioner signed Mutual's return for the year 1944, he testified that he had not examined it, but accepted it as being correct because of his confidence in the auditor who prepared it, and that he was not aware that a dividend was reported therein. He stated that he knew nothing about the matter until it was called to his attention in 1945 by a certified public accountant in connection with an audit of Mutual's books and that at that time he ordered a reversal of the dividend entries. All of the evidence on this item points to the fact that the recording of a dividend on Mutual's preferred stock as of December 22, 1944, was in error because of the misunderstanding of the auditor. A bookkeeping entry, even though reflected in the return, cannot, of course, be considered as evidencing the payment of a dividend, where the evidence shows that the entry was erroneous. See J. M. Loftis, 6 B.T.A. 725, J. W. Thompson, 10 B.T.A. 390. We accordingly hold that the respondent erred *101 in determining that the petitioners received a dividend from Mutual in 1944. Salary Adjustments The parties have included in their written stipulation an agreement that adjustments of salaries of the petitioner for the respective years, as set forth in the notice of deficiency, are correct. This agreement will be given effect in the Rule 50 recomputation. Decisions will be entered under Rule 50. Footnotes
1. Mutual Brewing Company, Inc. in 1944 charged its name to Pioneer Distributing Company and that company in 1946 changed its name to Pioneer-Tacoma-Inc.↩
2. United Union Breweries, Inc. in 1945 changed its name to Pioneer Brewing Company.↩
3. This amount is made up of the following items: ↩
Hart's Union Stock
$146,666.66
Hart's Mutual Stock
75,000.00
Debt to Everett Bank
73,333.34
Note held by Coleman
30,000.00
Total
$325,000.00
*. Per returns.↩
4. The reason the year-end balance was less than $220,000 was because the $100,000 loan from Williams Brothers to Union was first erroneously credited to petitioner's running account, but the entry was reversed in 1945.↩
5. On the question of law the Court of Appeals said: "The principles of law invoked by each party are relatively simple. When the principal shareholder of a corporation makes a permanent withdrawal of funds from the company, he is deemed to have received income at the time of withdrawal, although the formalities of a dividend distribution have not been observed and the payment is recorded on the books of the company as a loan. Chattanooga Savings Bank v. Brewer, 6 Cir., 17 Fed. (2d) 79; cf. Christopher v. Burnet, 60 App. D.C. 365, 55 Fed. (2d) 527; Anketell Lumber & Coal Co. v. United States, 1 Fed. Supp. 724, Ct. Cl. But if the stockholder borrows money from the company, and subsequently the company cancels the debt, income accrues to the stockholder at the time when the character of the withdrawal changes from a loan to a distribution of profits. Cohen v. Commissioner, 6 Cir., 77 Fed. (2d) 184; cf. Fitch v. Helvering, 8 Cir., 70 Fed. (2d) 583↩. * * *"
6. Remanded on other issues (C.A. 2), 133 Fed. (2d) 1005↩.