Bernard Schwartz and Selma Schwartz (Husband and Wife) v. Commissioner.
Schwartz v. Commissioner
Docket No. 1124-62.
United States Tax Court
T.C. Memo 1963-340; 1963 Tax Ct. Memo LEXIS 8; 22 T.C.M. (CCH) 1786; T.C.M. (RIA) 63340; December 27, 1963
Carl F. Bauersfeld, for the petitioners. Albert Squire, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the income tax of petitioners for 1957 and 1958 in the respective amounts of $2,283.30 and $30,397.45. The issues are whether *9 Bernard Schwartz, who will sometimes be referred to as petitioner, received dividend distributions when his corporation paid premiums on his life insurance policies and his note given in a stock purchase transaction. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Bernard and Selma Schwartz are husband and wife, residing in Philadelphia, Pennsylvania. They filed their joint income tax returns for the years in issue with the district director of internal revenue, Philadelphia, Pennsylvania. The Alper-Schwartz Co., Inc., hereinafter called the corporation, is a Pennsylvania corporation, engaged in the business of manufacturing women's dresses in Philadelphia. It filed income tax returns on the basis of taxable years ending on October 31st. From 1951 until February 10, 1956, it had 640 shares of capital stock issued and outstanding, 500 shares of which were owned by Samuel Alper and the remaining 140 shares by Bernard Schwartz. Prior to 1956, differences arose between the two shareholders as to the conduct of the corporation's business and they decided one of them would have to get out of the business. On February 10, 1956, Alper, Bernard *10 Schwartz and the corporation (of which Alper was then president) entered into a written agreement which provided in part, as follows: D. WHEREAS, SCHWARTZ desires to buy and ALPER is desirous of selling all of his stock in the said ALPER-SCHWARTZ CO., INC., (formerly Rudolph-Marged, Inc.), including any and all other claims of any nature whatsoever he may have against said ALPER-SCHWARTZ CO., INC., NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, THE PARTIES HERETO HAVE AGREED and DO AGREE as follows: 1. ALPER agrees to sell, and SCHWARTZ agrees to buy, all of ALPER's stock in ALPER-SCHWARTZ CO., INC. (formerly Rudolph-Marged, Inc.) for the sum of $110,000.00, payable in the following manner: (a) $75,000.00 immediately upon execution of this Agreement, receipt of which is hereby acknowledged; and (b) The balance of $35,000.00 within two (2) years from the date hereof, bearing interest at 4 1/2% per annum on unpaid balance; (c) As collateral security for the payment of the said $35,000.00, SCHWARTZ is to deliver to ALPER a Judgment Note in said amount, executed by himself and his wife, Selma Schwartz, and by Benjamin Abramson *11 and his wife Clayre Abramson, said Note to be for a period of two years from date, bearing interest at 4 1/2% per annum. It is understood that this Note is not to be entered of record unless there is a default in the payment thereof for a period of ten days after due date; and immediately upon payment of said $35,000.00 with interest thereon, said Note is to be returned to SCHWARTZ. * * *
4. Contemporaneously with the execution of this Agreement, ALPER shall endorse in blank his Certificates for said 500 shares of capital stock of Rudolph-Marged Inc. (now called ALPER-SCHWARTZ CO., INC.), and transfer and turn over said Certificates to SCHWARTZ. 5. ALPER shall immediately resign in writing as an Officer and Director of said ALPER-SCHWARTZ CO., INC. and secure any and all other instruments or resignations necessary to properly effectuate his withdrawal from said ALPER-SCHWARTZ CO., INC. SCHWARTZ acknowledges receipt of an assignment of the said certificates for 500 shares of capital stock of Rudolph-Marged, Inc. (now called ALPER-SCHWARTZ CO., INC.), and of ALPER's written resignation as an Officer and Director of ALPER-SCHWARTZ CO., INC. The remaining portions of the preamble *12 and clauses in the written agreement merely recite the agreement of the signers with regard to any indebtedness between Alper and the corporation or the corporation and Alper Blouse Co., Inc. and the disposition of an automobile registered to Alper but carried by the corporation as an asset. The agreement is signed by Alper and Schwartz as individuals and by the corporation with Alper signing as president and Schwartz as secretary. The $75,000 cash and the $35,000 note dated February 10, 1956 were delivered to Alper and his stock certificate for 500 shares endorsed in blank was turned over to Schwartz by Alper. The corporation minute book shows a special board of directors meeting on February 10, 1956 and the minutes of this meeting show that Alper's resignation as president was accepted and Schwartz was elected president and that Schwartz "announced that he had consummated the purchase of the Stock of this Corporation owned by Samuel Alper for $110,000.00 payable * * * as set forth in the Agreement of Sale * * *." The minutes of this meeting go on to state that: The Chairman [Schwartz] further explained that the reason why the purchase was made was because it was his intention *13 of having the $35,000.00 of stock be retired as Treasury stock by payments from the Company so that in the very near future a Pension Plan can be set up, using the $35,000.00 of stock as a first deposit. It is stipulated that on February 10, 1956 the corporation issued a certificate for 340 shares of its capital stock to petitioner. The corporation also started a special cash account on its books wherein monthly payments were entered to fund the $35,000 note with the actual payments thereto deposited in a special bank account. By a letter written by Alper to Schwartz on May 3, 1956, a credit of $6,070.98 on the note was authorized by Alper. This credit grew out of some transactions between the corporation and Alper Blouse Co., Inc. which was Alper's corporation. The note was paid by the above credit and the corporation's checks dated February 10, 1958 for $28,929.02 for the balance due on princi al and $2,631.13 for interest due on the note. Also on February 10, 1958 the corporation issued to itself 160 shares of its capital stock. The corporation had earned surplus and undivided profits of $87,428.08 as of November 1, 1956, and not less than that amount during the years involved *14 herein. Prior to November 1, 1958 the corporation paid only one dividend; this was paid during the taxable year ended October 31, 1958. This dividend was paid by issuing additional capital stock of the corporation. The corporation established a pension plan trust, entitled the Alper-Schwartz Co., Inc. Pension Trust, on October 31, 1958. The petitioner was the sole trustee of this Pension Trust. On May 11, 1959 the corporation was notified by the district director of internal revenue that, on the basis of information previously submitted, the Pension Trust was a qualified trust under section 401(a) and exempt from income tax under section 501(a) of the Internal Revenue Code of 1954. The corporation's income tax return for the taxable year ended October 31, 1958 was filed on July 14, 1959. A deduction was claimed on this return of $45,379 for amounts contributed to the Pension Trust. On August 23, 1959 the corporation sold its treasury stock to the Pension Trust. From time to time since 1951, or before, petitioner borrowed money from the corporation. Sometimes he received funds directly from the corporation and other times the corporation would pay his personal *15 expenses. Sometimes petitioner signed notes to evidence these loans and the corporation recorded these personal disbursements in an account entitled "Loans Receivable - B. Schwartz." Petitioner began to repay these loans in January 1959. In 1957 and 1958 all bills paid by the corporation were first approved for payment by the petitioner. All checks issued by the corporation in these years were signed by petitioner. In 1957 and 1958 the petitioner owned a number of policies of life insurance on his life. In 1957 the corporation paid three premiums, totaling $4,151.45, and in 1958 the corporation paid eight premiums, totaling $9,316.76, which petitioner owed on these policies. None of the above payments was recorded in the account "Loans Receivable - B. Schwartz." The corporation recorded each of the 11 payments in an expense account entitled "Life Insurance Premiums." Also recorded in this account were the amounts of premiums paid by the corporation with respect to other policies of life insurance on the life of petitioner which the corporation owned. The petitioner signed no notes in 1957 or 1958 with respect to the life insurance premiums which the corporation paid for him in these *16 years. During the years 1957 and 1958 the corporation employed a firm of public accountants to do monthly audits and prepare year-end financial statements. Petitioner did not advise the accountant in 1957 or 1958 that the corporation had paid his personal bills for life insurance premiums. Sometime after October 31, 1959 the corporation's public accountants learned that the corporation had paid petitioner's life insurance premiums in 1957 and 1958. The accountants thereupon made an adjusting entry on the corporation's books "as of" October 31, 1959, transferring the amounts of these premiums to the account "Loans Receivable - B. Schwartz." In his notice of deficiency respondent determined Schwartz received distributions taxable as dividends within the meaning of section 301, Internal Revenue Code of 1954, in 1957 and 1958 in the amounts of $4,151.45 and $9,316.76, respectively, for insurance premiums the corporation paid on his personal insurance policies. Respondent also determined that Schwartz received dividend income in 1958 in the amount of $37,620 when the corporation paid the note he had executed to Alper on February 10, 1956. Opinion Whether *17 payments made by a closely held corporation to or for the benefit of its main stockholder are loans or dividends is a question of fact. Elliott J. Roschuni, 29 T.C. 1193, affd. per curiam 271 F. 2d 267. The critical inquiry is whether at the time of the corporate payments the stockholder intended to repay the corporation. Estate of Helene Simmons, 26 T.C. 409. It is admitted the premium payments on life insurance policies Schwartz owned were payments by the corporation for his benefit. The question is whether it was intended at the time of the corporate payments for the stockholder's benefit that the amount of such payments would be repaid to the corporation by the stockholder. The only direct evidence of Schwartz's intent with respect to repayment of the sums the corporation paid as premiums on his policies is his rather general statement that he always intended to "pay back * * * loans." During the years 1957 and 1958 the corporation made 11 payments of premiums, totaling over $13,000 on petitioner's personal life insurance policies. Petitioner was the president and sole stockholder of the company during these years. He alone signed the *18 checks and directed the payment of the corporation's and his own bills. Although the corporation carried a loan account for its president on its books, where amounts paid on his personal bills would be recorded, these premium payments were not recorded in that account. Each of the 11 payments was recorded by the bookkeeper of the corporation in one of the corporation's expense accounts. This would not indicate a present intention on the part of Schwartz to reimburse the corporation for the amounts paid. Schwartz argues it was all a bookkeeping error. The bookkeeper that made the entries did not testify. Schwartz testified the corporation had a different bookkeeper than the one it had in 1957 and 1958. Although the corporation was paying insurance premiums on policies it owned, it is abundantly clear Schwartz was well aware of the corporate payments of premiums on policies he owned. He must have been equally aware of the fact that these payments were not being recorded in his loan account. He knew he was not paying anything into his loan account. For the years 1956, 1957 and 1958 the annual year-end debit balance in this loan account remained fairly constant - always between $15,000 *19 and $16,000. And yet in 1958 alone, petitioner's corporation paid over $9,000 personal insurance premiums which he must have known would substantially increase his loan account. It is true that sometime after October 31, 1959 a transfer entry was made and the total of these premium payments was placed in Schwartz's loan account. It is also true that later in 1962 Schwartz paid to the corporation the balance due in his loan account. The corporation had a public accountant who made monthly audits and year-end statements for the corporation. Schwartz saw this accountant once a week or once every two weeks. This accountant testified that sometime after October 31, 1959 he learned of the 1957 and 1958 corporate payments of Schwartz's life insurance premiums and that on some unremembered date after October 31, 1959 he caused the "as of" October 31, 1959 transfer entry to be made in the loan account. There is some indication in the record that the accountant learned about these payments from the revenue agent and that the transfer entry was made after the agent proposed to treat the payments as dividends to Schwartz. At any rate, the fact that the accountant learned about these payments *20 in a later year and took steps to indicate they would be repaid, does not evidence Schwartz's intent in 1957 and 1958 with regard to the payments. We hold the insurance premium payments in question were dividend payments to petitioner. The second issue involves respondent's determination that petitioner received a dividend distribution in 1958 of $37,620 when the corporation paid his note to Alper. It is admitted the corporation paid this note indebtedness and that it had accumulated earnings and profits in excess of the amount of said payment. Petitioner's only argument is that the note was not his debt but rather the corporation's own debt which it incurred when it purchased 160 shares of its stock from Alper. Petitioner makes no argument that the 160 shares issued to the corporation in February 1958 were part of his shares acquired by the contract and that they were redeemed by the corporation paying his note. Such a contention would be a little more plausible than saying the corporation received stock from Alper, but of course, it would make the redemption completely vulnerable to a determination that it was essentially equivalent to a dividend. Petitioner rests his entire *21 case on a contention that is not very clear but it seems to be that it was intended at all times the corporation was purchasing Alper's 160 shares and therefore its issuance in 1958 of stock to itself made it a purchaser of Alper's stock. The evidence just does not support petitioner's contention that the note was ever the corporation's obligation or that it bought 160 shares of Alper's stock. Petitioner relies entirely upon his own testimony and the testimony of his friend and attorney Benjamin Abramson. The gist of their testimony is that despite the wording of the stock sale contract of February 10, 1956, which admittedly evidences a sale of all of the Alper stock to Schwartz, it was intended and understood that the corporation was purchasing $35,000 worth of the Alper stock, or 160 shares. This is a major rewrite of the sales contract and wholly out of harmony with other facts and contrary to the testimony of Alper. The latter testified that when he sold his stock in February of 1956 it was not his understanding that he was selling any of his shares to the corporation and that in the negotiations prior to the sale there was no discussion which dealt with his selling any of his *22 shares to the corporation. He was asked no questions with respect to this portion of his testimony on cross-examination. The contract evidences the transfer of the Alper stock certificate signed in blank, from Alper to Schwartz. It was not until two years later that the corporation became the owner of a stock certificate for 160 shares. These were not Alper's shares for all of his ownership in the corporation's stock passed to Schwartz on February 10, 1956, upon the execution of the contract, and the delivery of his stock certificate to Schwartz. It is not of much significance that Schwartz had the corporation issue a certificate to him on February 10, 1956 for 340 shares. In the sales transaction he received Alper's 500 share certificate which meant he owned all of the corporation's stock. Anything he might do or have the corporation do thereafter with respect to canceling or splitting the Alper shares between himself and the corporation would be of no economic significance. Petitioner owned all of the issued and outstanding stock of the corporation before it acquired the 160 shares on February 10, 1958. Petitioner had owned all of such stock for two years before the 160 shares *23 were acquired by the corporation. The tax consequences to petitioner became fixed by the corporation paying petitioner's note to Alper. The corporation was not indebted to Alper. The corporation was not buying any of Alper's stock by such payment. Whether the corporation, upon such payment issued to itself a certificate for 160 shares or not, the result would be the same. The issuance of such a certificate to itself in no way establishes the corporation bought any of the shares of Alper who had not been a stockholder for at least two years. What the corporation did thereafter with the 160 shares, such as selling them to the pension trust, has no bearing at all on the issue here. Since the corporation paid petitioner's indebtedness, the payment constituted a dividend to him. Wall v. United States, 164 F. 2d 462. Decision will be entered for the respondent.