ROZELLE MCSPADDEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1819–63.  Filed June 12, 1968.

---

*Clarence P. Brazill, Jr.*, for the petitioner.
*Roy E. Graham*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income taxes and additions to taxes for the years and in the amounts as follows:

| Year | Deficiency | Addition to tax under sec. 6653(b); I.R.C. 1954 |
|------|-----------|-----------------------------------------------------|
| 1959 | $70.79 | ------------ |
| 1960 | 837,280.28 | $418,640.14 |
| 1961 | 1,422,935.04 | 711,467.52 |

The parties have disposed of certain of the issues raised by the pleadings by agreement, or petitioner's statement that the adjustment would not be contested and respondent has conceded that no part of the deficiencies was due to fraud, leaving for our decision the following:

(1) Whether amounts of $284,904.69 and $876,272.65 which were received by petitioner's husband in 1960 and 1961 from discounting fictitious mortgages on which neither petitioner nor her husband was liable are includable in petitioner's income; and

(2) Whether the burden of proof is on respondent to show that the amounts of $43,050.01 and $73,800.01 were payments actually made in 1960 and 1961 by a third party on notes on which petitioner's husband was liable, and if such payments were so made, whether the amounts are includable in petitioner's income for 1960 and 1961.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is an individual who resided in Lubbock, Tex., at the time the petition in this case was filed. Petitioner and her husband, Coleman D. McSpadden (hereinafter referred to as McSpadden), filed joint Federal income tax returns for the years 1959, 1960, and 1961 with the district director of internal revenue at Dallas, Tex. Petitioner had some separate income during these years from the operation of a situs for mobile homes in Lubbock. This income was properly included in the income reported for the years here in issue and the deficiencies relate entirely to the income which respondent determined to have resulted from activities of petitioner's husband.

The income tax liability of petitioner's husband for the same years here in issue is pending before a bankruptcy court in Lubbock, Tex., in a proceeding designated, "In the Matter of Coleman D. McSpadden, Bankrupt, No. 852 in Bankruptcy, United States District Court for the Northern District of Texas, Lubbock Division." The statement attached to the statutory notice of deficiency from which the petition in this case was filed is identical to the statement attached to the Form 7900 which respondent sent to Coleman D. McSpadden and Roy Bass, trustee.

Prior to the taxable years here in issue, McSpadden had successfully engaged in a wide variety of business ventures in and around Lubbock. In early 1960, his principal business interest was farming. He operated as a sole proprietorship under the name of "Associated Growers." McSpadden also bought seed, sold farm produce, sold anhydrous ammonia fertilizer, and owned and operated grain elevators.

McSpadden used equipment in the fertilizer business which he purchased from Superior Manufacturing Co. of Amarillo, Tex. Prior to April 1960, Superior Manufacturing Co. was owned by Robert E. Clements and it was in the business of manufacturing LPG propane tanks, acid tanks, anhydrous ammonia fertilizer tanks and applicators, and various types of oil-refinery equipment.

McSpadden dealt with Superior Manufacturing Co. through its salesman, Harold E. Orr. Sometime prior to April 1960, Orr told McSpadden that Clements wanted to sell Superior Manufacturing Co. because he was getting old and wanted to retire. Orr asked McSpadden if he would like to buy a portion of that company. McSpadden had a net worth of about $875,000 at the time. However, he told Orr he did not have available cash to make the proposed purchase of 25 percent of the stock of Superior Manufacturing Co. Clements and Orr represented to McSpadden that the fair market value of the stock of the company at that time was $482,000. Orr told McSpadden that Clements could arrange a way to finance his purchase of stock of Superior Manufacturing Co. McSpadden then agreed to purchase some of the stock and stated that he would like to acquire 51 percent of the stock rather than 25 percent.

Superior Tank Co. was incorporated on April 26, 1960, and on April 30, Superior Tank Co. acquired all of the stock of Superior Manufacturing Co. from Clements for $382,000 cash and a note for $100,000. Superior Manufacturing Co. was liquidated into Superior Tank Co. on May 14, 1960, and the name of Superior Tank Co. was changed to Superior Manufacturing Co. the following day.

The $382,000 cash was obtained by capital contributions from the five persons who had agreed to purchase stock of Superior Manufac-

turing Co. These capital contributions were made by the following persons in the amounts indicated:

| | |
|---|---:|
| Coleman D. McSpadden | $202,000 |
| R. W. Davis | 20,500 |
| John Simmons | 79,500 |
| Subtotal | 302,000 |
| Ruel W. Alexander | 40,000 |
| Harold E. Orr | 40,000 |
| Total | 382,000 |

McSpadden, Davis, and Simmons obtained $300,000 [1] of their cash requirement by floating false chattel mortgages on nonexistent fertilizer tanks through the original Superior Manufacturing Co. The bogus mortgage transactions were carried out by Orr under the direction of Clements. McSpadden knowingly signed the false mortgages and received $200,000 which he used toward the acquisition of 51 percent of the stock of Superior Manufacturing Co.

Alexander and Orr obtained their cash requirements from other sources. There was an account on the books of the original Superior Manufacturing Co. in the amount of $36,900, payable to Billie Sol Estes. With Estes' permission, Clements wrote a check of the company for the amount due Estes and the check was endorsed over to Orr and Alexander. Orr and Alexander each borrowed $21,550 from the original Superior Manufacturing Co. to obtain the balance which he needed to complete his stock purchase.

McSpadden was the controlling shareholder of the Superior Manufacturing Co. (hereinafter referred to as Superior) which resulted from the change of the name of Superior Tank Co. after the old Superior Manufacturing Co. had been liquidated into Superior Tank Co. McSpadden was originally the president of Superior. Orr was responsible for the management of Superior and sometimes after Superior was organized replaced McSpadden as president of the company because other fertilizer dealers who were customers of Superior objected to doing business with a supplier whose president was a competitor of theirs in the fertilizer business.

Originally the stockholders of Superior planned to sell preferred stock in Superior to raise money to repay the bogus mortgages. Such stock was issued to them and two or three sales of such preferred stock were made. However, the stockholders of Superior, upon being informed that the sales of such stock violated the Securities Law of

---

[1] It was intended to raise $302,000 in this way but an error was made. Orr advanced $2,000 of his personal cash to make up the difference and he was later reimbursed by the new Superior Manufacturing Co.

Texas, ceased selling such stock and thereafter Superior made the payments on the mortgages.

Simmons, the purchaser of $79,500 worth of stock of Superior, was in the grain storage business. Shortly after Superior acquired the stock of the original Superior Manufacturing Co. and liquidated that company, McSpadden and Orr heard that the U.S. Government had discovered a shortage in Simmon's grain storage account which information caused McSpadden to suspect that Simmons was near bankruptcy. McSpadden believed that Simmons' financial condition could lead to difficulties for Superior, and for that reason asked Simmons to withdraw from Superior. McSpadden, Alexander, and Orr acquired Simmons' stock in Superior and assumed his liability on the false mortgages which he had executed to acquire the stock.

Superior continued to make the periodic payments on the false mortgages which had been executed by McSpadden in order for McSpadden to acquire the Superior stock. During 1960 and 1961 Superior made payments on mortgages executed or assumed by McSpadden to obtain the funds to purchase Superior's stock, to the following companies in the amounts as shown:

| Finance company | 1960 [1] | 1961 [2] |
|---|---|---|
| Southwestern Investment Co | $8, 757. 70 | $15, 013. 20 |
| First Acceptance Corp | 10, 826. 20 | 18, 559. 20 |
| C.I.T. Corp | 7, 007. 00 | 12, 012. 00 |
| Associates Investment Co | 7, 659. 38 | 12, 976. 08 |
| First Acceptance Corp | [3] 6, 194. 10 | [3] 10, 618. 45 |
| C.I.T. Corp | [3] 2, 695. 63 | [3] 4, 621. 08 |
| | [4] 43, 050. 01 | 73, 800. 01 |

[1] Payments on the notes were made for 7 months starting in June.

[2] Payments on the notes were made for 12 months in 1961.

[3] These items were the notes of John W. Simmons for his share of the stock purchased. On May 15, 1960, Simmons endorsed his stock over to Coleman D. McSpadden, Harold E. Orr, and Ruel W. Alexander, and they assumed his liabilities on the notes. His stock was reissued to McSpadden, Orr, and Alexander with McSpadden receiving 68.46045 percent of this stock. McSpadden assumed the liabilities on the records of the finance companies, made the monthly payments, and was reimbursed by Superior. Only his prorata share, 68.46045 percent, of the total payment for the year is included.

[4] This is a stipulated figure although the stipulated individual items total $43,140.01.

Simmons offered to sell his grain storage business to McSpadden but McSpadden considered the business to be too heavily encumbered and declined to buy it. McSpadden and Orr came to Amarillo in August 1962 at the insistance of Simmons' attorney who met with them in Amarillo. In this meeting Simmons' attorney told McSpadden and Orr that he knew all about the method they had used to purchase their Superior stock and that he would "blow the whistle" if they did not "bail out" Simmons.

After McSpadden bought Simmons' grain storage business, he floated additional false mortgages [2] to pay for the purchase, and after purchasing Simmons' business McSpadden began operating the grain storage business.[3]

Shortly after the acquisition by Superior of the business of the original Superior Manufacturing Co., Orr was approached by Billie Sol Estes and asked to cause Superior to float some false mortgages on his behalf. When Orr informed McSpadden of Estes' demand, McSpadden refused to consent to the demand, partly because Estes was a particularly aggressive competitor of McSpadden in the fertilizer business. Billie Sol Estes then informed McSpadden that he knew about the false mortgages which had been floated through Superior, and, furthermore, that prior to the sale of the stock of the old Superior Manufacturing Co., he (Estes) and Clements had floated false mortgages through that company. McSpadden then learned that Superior was liable on a substantial amount of bad paper other than that floated after his stock acquisition.

Between March 1960 and February 22, 1962, Billie Sol Estes and McSpadden floated about $20 million worth of false mortgages on nonexistent tanks, through Superior. Estes caused about $18 million to be floated, and McSpadden's activities account for about $2 million. McSpadden used the proceeds to expand his grain storage business and, in turn, used the income from his grain storage business and his other businesses to meet monthly payments on the false mortgages.

The usual method used by McSpadden to float the false mortgages was similar to the method generally employed by Billie Sol Estes. McSpadden would persuade a person, usually a farmer, to purchase from Superior a fertilizer tank or tanks and lease such tank or tanks to McSpadden. The person who agreed to make such purchase, referred to sometimes as a "horse," [4] was paid a 10 percent commission for his participating in the transaction. McSpadden would tell the person he was trying to induce to agree to buy the tanks that he needed to buy more storage tanks to use in his anhydrous ammonia fertilizer business, but that his credit was exhausted. He would ask the "horse" to sign a contract for the purchase of tanks from Superior and a note and mortgage for the purchase money. McSpadden would usually execute a lease with the purchaser of the tank leasing the tank back from the "horse," the rental being in the approximate amount of the mortgage payments stated in the mortgage. The "horse," who believed that the

---

[2] The false paper which was floated in these transactions consisted of notes, chattel mortgages, conditional sales contracts, and equipment leases. The term, "mortgage," will be used to refer to any type of false paper used in transactions.

[3] See *Simmons* v. *McSpadden,* 363 S.W. 2d 888 (Tex. 1962), an action arising out of this transaction.

[4] Billie Sol Estes is credited with the coinage of this term.

tanks were actually delivered to McSpadden for his use, would receive 10 percent of the mortgage proceeds as his commission and would receive monthly checks purportedly as rental payments from McSpadden or Superior to meet the mortgage payments.

When the executed mortgage and note and a financial statement had been obtained from the "horse," Superior would discount the mortgage and transfer part of the proceeds to McSpadden. On some occasions the financial statements were falsified and forged credit references were used. No tanks were actually delivered to anyone or otherwise involved in these transactions. With the exception of a guarantee of Superior's indebtedness to Pacific Finance Co., no officer or employee of Superior endorsed or otherwise personally guaranteed the indebtedness of Superior or its paper discounted with the finance companies.

In transactions with Pacific Finance Co. up to May or June 1961, McSpadden, Orr, and Alexander gave their personal guarantees of Superior's indebtedness under circumstances hereinafter more fully set forth.

McSpadden used the money he received through discounting the false mortgages to build grain storage tanks. By February 1962, McSpadden had acquired grain storage capacity of 7½ million bushels, which he calculated would give him an income of $1 million per year. Twenty percent of the income from grain storage was used to pay construction costs of the facilities leaving the remainder available for other purposes, including payment of the false mortgages on nonexistent tanks.

In February 1962 McSpadden had a licensed storage capacity of 5 million bushels in operation and was attempting to get licensed for an additional 2½ million bushels.

Either McSpadden or Superior made monthly payments to the "horses" to cover the installments due on the notes and mortgages, until April 1962 when McSpadden was declared a bankrupt.

In addition to the income from grain storage, McSpadden had income from his produce and fertilizer businesses. McSpadden expected such income to be between $250,000 and $500,000 a year. McSpadden also expected accelerated depreciation of grain storage facilities to provide a cash flow available for the false mortgage payments.

McSpadden did not cosign or endorse the mortgages executed by the "horses." One "horse," a man named John P. Gallagher, asked McSpadden to sign a piece of paper promising to guarantee payment of the mortgages executed by him, and McSpadden, on one occasion on March 22, 1961, signed such a guarantee. Superior would endorse

the mortgages which it discounted to the finance companies. However, Superior sometimes endorsed such mortgages without recourse.

On February 17, 1961, two representatives from Pacific Finance Co. met with Orr and Alexander. During the course of the meeting they stated that Pacific Finance Co. had learned that Billie Sol Estes had floated false mortgages on nonexistent pumps through other companies, which had discounted the mortgages to Associates Investment Co. Pacific Finance Co. had made this discovery in late 1960 during the course of negotiations to merge with Associates Investment Co. The two representatives of Pacific Finance Co. then asked that Orr, Alexander, and McSpadden guarantee loans which Pacific Finance Company had been making to Superior. Orr and Alexander signed an agreement to pay Pacific Finance Co. "in the event any of the chattel mortgages that were sold to Pacific Finance Company became delinquent, and if they asked that the money be paid by the company, which was Superior Manufacturing Company, and the Company wasn't able to pay them." McSpadden was not present at this meeting, but the agreement was mailed to him for his signature and he signed it.

In February 1961 and up until June 1961, Superior was obtaining direct loans from Pacific Finance Co. and giving Pacific, for security, the notes which it received on conditional sales contracts. Under the loan agreement Pacific Finance Co. was entitled to inspect the books of Superior. Pacific Finance Co. attempted to make such an inspection in May 1961, but Superior refused to permit it. As a result of this impasse, Pacific Finance Co. and Superior agreed to rearrange the loan procedure. Pacific Finance Co. agreed to buy chattel mortgages on equipment sold by Superior, rather than take purchase notes as security for loans to Superior. The representatives of Pacific Finance Co. believed that under this arrangement Pacific would not need to examine Superior's books because the assignment of the chattel mortgage would be adequate protection. The new agreement became effective in June 1961.

The following schedule shows proceeds received by McSpadden from the false mortgage transactions indicated and transactions with Pacific Finance Co. during 1960 and 1961:

## 1960

| Finance company | Name of mortgagor | Date of mortgage | Gross amount of mortgage | Gross amount to McSpadden | Less; total payments and commissions | Net amount to McSpadden |
|---|---|---|---|---|---|---|
| Southwestern Inv. Co. | Richard W. Davis | 8/31/60 | $9,918.72 | $20,315.30 | $4,683.84 | $8,774.85 |
| C.I.T. | Wheeler Fertilizer | 8/31/60 | 14,520.00 | | 6,856.61 | |
| Southwestern Inv. Co. | Wheeler Fertilizer | 9/1/60 | 22,035.12 | | 15,608.21 | |
| Southwestern Inv. Co. | Billie Sol Estes | 9/1/60 | 26,156.40 | 47,406.88 | 14,821.96 | 13,191.21 |
| C.I.T. | Dick's Propane Service | 8/31/60 | 6,594.00 | | 3,785.50 | |
| First National Bank, Amarillo | Carroll A. Pendley | 10/21/60 | 17,670.00 | 15,500.00 | 11,780.00 | 3,720.00 |
| Pioneer Finance | Gillette Pipe & Supply | 10/12/60 | 19,360.00 | 15,000.00 | | 15,000.00 |
| Pacific Finance | W. J. Worsham | 11/16/60 | 76,464.00 | 58,295.00 | 30,174.00 | 28,121.00 |
| Pacific Finance | Gillette Pipe & Supply | 11/16/60 | 43,263.00 | 32,969.00 | 17,070.82 | 15,898.18 |
| Pacific Finance | Billie Sol Estes | 11/23/60 | 210,512.16 | 164,306.94 | 30,107.49 | 124,199.45 |
| Pioneer Finance | Carroll A. Pendley | 12/2/60 | 43,200.00 | 90,000.00 | 14,000.00 | 76,000.00 |
| Pacific Finance | Grady Acuff | 11/23/60 | 76,275.36 | | 0 | |
| Totals | | | 565,903.76 | 433,793.12 | 148,888.43 | 284,904.69 |

## 1961

| Finance company | Name of mortgagor | Date of mortgage | Gross amount of mortgage | Gross amount to McSpadden | Less; total payments and commissions | Net amount to McSpadden |
|---|---|---|---|---|---|---|
| C.I.T. | E. A. Edwards | 2/4/61 | $61,360.00 | $48,932.00 | $25,652.40 | $23,279.60 |
| Pacific Finance | E. A. Edwards | 2/3/61 | 52,000.00 | 46,775.00 | 44,408.10 | 2,366.90 |
| C.I.T. | S. T. Thornton | 2/17/61 | 21,600.00 | 15,535.38 | 3,960.00 | 11,575.38 |
| Pioneer Finance | S. T. Thornton | 2/23/61 | 21,600.00 | 16,000.00 | 4,320.00 | 11,680.00 |
| C.I.T. | S. T. Thornton | 3/22/61 | 7,927.20 | 5,701.48 | 1,717.56 | 3,983.92 |
| C.I.T. | John P. Gallagher | 3/22/61 | 29,025.00 | 20,875.67 | 5,321.25 | 15,554.42 |
| Pioneer Finance | Carroll A. Pendley | 3/22/61 | 28,350.00 | | 7,297.50 | |
| Pioneer Finance | John P. Gallagher | 3/22/61 | 20,260.00 | 36,000.00 | 3,712.50 | 24,990.00 |
| C.I.T. | J. Roy Crutchfield | 4/19/61 | 21,465.00 | 15,438.29 | 4,327.50 | 11,110.79 |
| Pacific Finance | S. T. Thornton | 4/19/61 | 15,336.00 | 11,675.00 | 4,309.13 | 7,365.87 |
| C.I.T. | Carroll A. Pendley | 4/24/61 | 41,850.00 | 30,099.81 | 9,475.00 | 20,624.81 |
| C.I.T. | Carroll A. Pendley | 5/1/61 | 52,020.00 | 38,500.00 | 12,520.00 | 25,980.00 |
| Commercial Credit Corp. | S. V. Willis | 6/23/61 | 27,000.00 | 20,000.00 | 3,600.00 | 16,400.00 |
| Pioneer Finance | Carroll A. Pendley | 7/11/61 | 88,347.60 | 93,821.00 | 11,779.68 | 74,604.76 |
| Walter E. Heller | S. V. Willis | 7/5/61 | 55,774.28 | | 7,436.56 | |
| Pacific Finance | E. A. Edwards | 8/30/61 | 57,240.00 | 122,600.00 | 24,292.00 | 88,444.00 |
| Walter E. Heller | E. A. Edwards | 8/30/61 | 114,096.00 | | 9,864.00 | |
| Associates Invest. | J. D. Greeson | 8/16/61 | 180,802.20 | | 18,080.22 | |
| Walter E. Heller | E. A. Edwards | 8/12/61 | 167,320.00 | 92,751.00 | 26,234.00 | 196,985.78 |
| Walter E. Heller | E. A. Edwards | 8/31/61 | 51,612.00 | 155,000.00 | 6,501.00 | |
| Walter E. Heller | J. Roy Crutchfield | 8/16/61 | 132,480.00 | 84,400.00 | 20,956.00 | 63,444.00 |
| Associates Invest. | Carroll A. Pendley | 9/13/61 | 44,220.00 | | 3,685.00 | |
| Pacific Finance | J. D. Greeson | 9/11/61 | 99,216.00 | 98,585.00 | 24,164.00 | 70,738.00 |
| Walter E. Heller | J. D. Greeson | 9/5/61 | 30,718.80 | 19,034.00 | 3,071.88 | 15,962.12 |
| Walter E. Heller | S. T. Thornton | 10/5/61 | 198,720.00 | 121,560.00 | 21,810.00 | 99,690.00 |
| Walter E. Heller | John P. Gallagher | 10/27/61 | 107,880.00 | 70,400.00 | 6,742.50 | 63,657.50 |
| Pacife Finance | John P. Gallagher | 11/29/61 | 53,088.00 | 34,672.00 | 6,785.20 | 27,886.80 |
| Pacific Finance | Carroll A. Pendley | | | | | |
| Totals | | | 1,771,298.08 | 1,195,295.63 | 322,022.98 | 876,272.65 |

In February 1962 representatives of the Pacific Finance Co. informed representatives of Superior that Pacific Finance had knowledge of the false mortgage scheme and Pacific Finance demanded immediate payment by Superior of the amounts advanced on the false mortgages. At this meeting of representatives of Pacific Finance Co. and of Superior the latter agreed that Superior would pay Pacific Finance Co. $100,000. Superior made the $100,000 payment to Pacific Finance, and the representatives of Pacific Finance Co. did not at that time press Superior further for payment in full.

Shortly thereafter, there was a meeting in Dallas of all the finance companies which had purchased the false mortgages from Superior. The finance companies tried to work out an arrangement to take over McSpadden's business interests and arrange to operate those businesses in such a manner as to be able to pay off the mortgages. Before such an arrangement was concluded, representatives of the Federal Bureau of Investigation began an investigation of the transactions of Superior and upon learning of such investigation, the meeting of creditors of Superior promptly adjourned.

In March 1962 Estes, McSpadden, Orr, Alexander, and Superior were indicted on 29 counts relating to the false mortgage scheme by a grand jury in the U.S. District Court for the Western District of Texas. On July 13, 1963, the defendants, except Estes, pleaded guilty on five counts, and on September 20, 1962, McSpadden was sentenced to 5- and 10-year sentences to run concurrently. At the time of the trial of this case McSpadden had served the required portion of his prison term and had been released from prison.

Billie Sol Estes was tried on the same indictment and he was convicted on five counts, receiving sentences totaling 15 years. *Estes* v. *United States*, 335 F. 2d 609 (C.A. 5, 1964), affirming an unreported case (W.D. Tex.), certiorari denied 379 U.S. 964 (1965).

Respondent in his notice of deficiency determined that petitioner received "Income from transactions involving the discounting of notes on fertilizer tanks" in the amounts of $850,867.35 and $1,194,062.80 for the years 1960 and 1961, respectively. The parties are now in agreement that net receipts of McSpadden from this source in the years 1960 and 1961, respectively, were $284,904.69 and $876,272.65, but petitioner contends that such net receipts are not income. No mention was made in the notice of deficiency of the receipt by petitioner or McSpadden of income from the payment by Superior in the years 1960 and 1961 of notes or mortgages executed or endorsed by McSpadden or on which he was otherwise obligated.

### OPINION

Respondent contends that the proceeds which petitioner's husband received as a result of the false mortgage transactions were taxable

to him under the holding in *James* v. *United States*, 366 U.S. 213 (1961), and other cases holding receipts from illegal transactions to constitute taxable income. Petitioner contends that the proceeds were received by McSpadden as loans, and that the receipt of a loan is not the receipt of income.

Most of the transactions which have been described in our findings did not either in form or in substance result in McSpadden's incurring a debt obligation other than the general obligation of a person who defrauds another to make restitution to the person defrauded.

The form of the transactions from which McSpadden received the funds was for Superior to be shown as a seller of merchandise, the "horse" as the purchaser, with the finance company paying funds to Superior upon assignment to it of the "horse's" chattel mortgage and mortgage note in favor of Superior. McSpadden was the "lessor" of the tanks "purchased" by the "horse" under the scheme. In substance, Superior and McSpadden were fraudulent conspirators, and the "horse" and the finance company [5] were victims of the fraud.

Even though fraudulently induced, the debt that was created was first between Superior and the "horse" in each transaction. The debt obligation of the "horse" shifted to the finance company when the mortgages were discounted, and Superior sometimes, if not always, remained liable. However, McSpadden never incurred the formal status of debtor. The only formal legal status which he incurred was that of lessee.

From these facts it follows that the proceeds from the assignment of the mortgages were not loans, insofar as McSpadden was concerned. They were the proceeds of a fraud carried out by McSpadden in concert with Superior. The record indicates that McSpadden and Superior both provided the funds for the monthly payments on the false mortgages. The record shows that McSpadden and Superior shared the proceeds received on discounting the mortgages, after commission payments to the "horses."

In *United States* v. *Rochelle*, 384 F. 2d 748 (C.A. 5, 1967), the court held that fraudulently obtained funds were taxable to the recipient, even though he had received them in the form of loans. The taxpayer in *Rochelle* had induced people to lend him money to invest in fantastic business opportunities. One of his deals was a chance to invest in an "upgrader" for low-grade uranium which would replace a $13 million uranium mill. The Court found that the taxpayer never had any intentions to fulfill his representation or to pay the moneys he received. See also *Cohen* v. *United States*, 297 F. 2d 760, 762, 764 (C.A.

---

[5] There is no evidence in this record to indicate that any of the finance companies are chargeable with the knowledge that certain of their agents were collaborating in the schemes for a "cut."

9, 1962), and *Charles R. Leaf*, 33 T.C. 1093 (1960), affirmed per curiam 295 F. 2d 503 (C.A. 6, 1961), in which loans "were treated as income for tax purposes."

The Court, in *Rochelle* (384 F. 2d at 751–752), stated that there was:

no qualitative difference with regard to taxability between the gains of an extortionist, held taxable in *Rutkin*, those of an embezzler, held taxable in *James*, and those derived by a confidence man like Addison [the taxpayer involved in the *Rochelle* case]. * * * Were we to hold otherwise, confidence men could avoid the tax consequence of their transactions by merely adding a false promise to pay to their other representations. * * *

McSpadden's position is weaker than that of the taxpayer in *Rochelle* because McSpadden did not incur even a false debt obligation as did the taxpayer in *Rochelle*. Petitioner argues that McSpadden's position is stronger than that of the taxpayer in *United States* v. *Rochelle, supra*, because he intended to make payment of the mortgage notes and he consistently made payments to the "horses."

The regular payments made by McSpadden to the "horses" do not make a debt obligation out of a transaction which was in form a rental obligation. The monthly payments which McSpadden (and Superior) made to the "horses," were the ordinary and necessary expense of perpetrating and concealing the fraud they were perpetrating. Although McSpadden testified that he hoped to balance out his income and outgo by the time he got a grain storage capacity of $7\frac{1}{2}$ million bushels, the evidence is not convincing that McSpadden actually had ever formed a clear intent to discontinue his fraudulent activities and to pay off all the mortgages. Even though McSpadden may have considered on two occasions that he would float no more bad paper, once after he acquired the stock of Superior and once after he was compelled to purchase Simmons' interest in Superior, the evidence shows that he in fact did continue to float bad paper and use the proceeds received from the fraudulent activity for personal purposes, including the expansion of his grain storage business. It is likely that every embezzler and some swindlers justify their actions to themselves by convincing themselves that they intent to return or repay the illegally obtained funds. Since thought or "plans" do not cause the illegally obtained funds to be "loans," such a rationalization is not even an intention to repay as the term is used in determining whether an amount received by an individual is a loan. At most the recipient of illegal funds has some vague hope that he will replace or repay the amount illegally obtained.

We conclude from the evidence in this case that McSpadden did not receive loan proceeds when he received a portion of the amounts paid to Superior on discount of the false mortgages but that he received the proceeds of a fraud inflicted upon third parties. Such illegal gains

are taxable income at the time of receipt. *James* v. *United States, supra; Rutkin* v. *United States*, 343 U.S. 130 (1952) ; and *United States* v. *Rochelle, supra.*

Amounts obtained by a taxpayer through embezzlement or by other fraudulent or illegal means are taxable despite the potential liability of that taxpayer to reimburse the victim. *Rutkin* v. *United States, supra; Charles R. Leaf, supra; Briggs* v. *United States*, 214 F. 2d 699 (C.A. 4, 1954) ; and *Estate of Joseph Nitto*, 13 T.C. 858 (1949). It is the control which the taxpayer has over the amounts illegally or fraudulently obtained which causes such amounts to be taxable income to him. The possibility that at some later date such a taxpayer might be required to make restitution does not cause receipts from a fraudulent or illegal activity not to be income in the year the amounts are received. *Estate of Helene Simmons*, 26 T.C. 409 (1956) ; *Benes* v. *United States*, 276 F. 2d 99 (C.A. 6, 1960) ; and *Elmer J. Benes*, 42 T.C. 358, 378 (1964), affirmed per curiam 355 F. 2d 929 (C.A. 6, 1966).

Petitioner does not contend that McSpadden was formally obligated on any of the transactions involving third-party mortgagors, except with respect to mortgages signed by John P. Gallagher and amounts received from transactions between Superior and Pacific Finance Co. McSpadden gave his personal guarantee to John P. Gallagher with respect to certain mortgages executed by Gallagher and on February 17, 1961, gave a generally personal guarantee of Superior's indebtedness to Pacific Finance Co.

In *Charles R. Leaf, supra*, this Court considered a situation where the sole shareholder of a corporation withdrew $131,500 from the corporation during a 1-month period, at a time when the corporation was insolvent and had no accumulated earnings and profits. With minor exception the withdrawn amounts were entered on the corporate books as loans to the shareholder. The shareholder repaid $22,805.20 to the corporation in the year of withdrawal, but repaid only $1,000 after that. Four years later he was convicted of knowingly and fraudulently transferring property of the corporation in contemplation of such corporation's bankruptcy. This Court, in holding that the withdrawals were taxable to such sole shareholder as income even though the corporation had no earned surplus at the date of the withdrawals, rejected the argument that the amounts were received as loans, stating (33 T.C. at 1096) :

The fact that these diversions were labeled "loans" * * * is not conclusive of their true character in the absence of any evidence of an intention to make repayment at the time of the taking. * * *

From the facts in the instant case we conclude that in form McSpadden was obligated as guarantor on amounts Superior received as "loans"

from Pacific Finance Co. between February 17, 1961, and the end of May 1961 and on the Gallagher mortgages executed on March 22, 1961. However, the money McSpadden received from Pacific Finance Co. during the period February 15 through May 1961 and on mortgages executed by Gallagher on March 22, 1961, was secured as much through fraud as the amounts McSpadden secured in the other transactions here involved on which he did not give a personal guarantee. The question here, as in *United States* v. *Rochelle, supra,* is whether the amounts secured by McSpadden from transactions in the form of "loans" constitute income to him. In *United States* v. *Rochelle, supra,* the court stated in this regard (384 F. 2d at 751) :

A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them. See James v. United States, supra, 266 U.S. at 219, 81 S. Ct. at 1055. Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a "wrongful appropriation [and comes] within the broad sweep of 'gross income' ". Ibid.

McSpadden made the same misrepresentations with respect to the amounts received from transactions which he personally guaranteed as he did from other transactions. He practiced the same fraud to secure the execution of the mortgage and the loan on the security of the mortgage notes. Under the holding in *United States* v. *Rochelle, supra,* the amounts received from these transactions were income from "wrongful appropriation" just as were the amounts McSpadden received from other transactions.

We therefore conclude that the entire amounts of $284,904.69 and $876,272.65 received by McSpadden in 1960 and 1961 from discounting fictitious mortgages are includable in petitioner's income for those years.

Respondent contends that in addition to the amounts which he determinded that McSpadden received from discounting false mortgages, he also received income in the amounts of $43,050.01 and $73,800.01 in 1960 and 1961, which amounts represented payments by Superior during 1960 and 1961 on notes signed or assumed by McSpadden. McSpadden floated several mortgages in 1960 in order to purchase his Superior stock from Robert E. Clements and a few months later assumed a part of the mortgages which were floated by Simmons for the same purpose.

Petitioner argues that respondent's contention with respect to the payment by Superior on notes signed or assumed by McSpadden is an issue raised by respondent at the trial on which respondent has the burden of proof. Petitioner contends that respondent has not borne his burden of proof.

Respondent determined in the notice of deficiency that petitioner failed to report income of $850,867.35 in 1960 and $1,194,062.80 in 1961, with the explanation that these amounts were "income from transactions involving the discounting of notes on fertilizer tanks." Prior to the trial, the parties stipulated that these figures should be reduced to $284,904.69 in 1960 and $876,272.65 in 1961. This stipulation did not change the designation of these amounts as income from discounting notes.

In his opening statement, respondent's counsel said that part of the amount by which the income from discounting notes was reduced was still in issue. Respondent contended that in addition to the $284,904.69 and $876,272.65 discounting income which he contended that McSpadden received in 1960 and 1961, petitioner also had income in those years from the payment of McSpadden's personal obligations by Superior. Respondent asserted that such amounts ($43,050.01 in 1960 and $73,800.01 in 1961) had been part of the original determination in the notice of deficiency. Respondent further informed the Court that, despite the stipulated adjustment, which appeared on its face to eliminate from issue any amounts exceeding the stipulated amount, neither party desired to amend the pleadings but would like the Court to include the issue with respect to the payment by Superior of McSpadden's note in its consideration of the case.

Petitioner's counsel stated no disagreement with the procedure proposed by respondent's counsel in his opening statement.

Respondent takes the position that his contention with respect to McSpadden's income from payment of his notes by Superior is not a new issue, citing *C. D. Spangler*, 32 T. C. 782 (1959), affd. 278 F. 2d 665 (C.A. 4, 1960). The *Spangler* case involved a taxpayer who organized a corporation for the construction of houses under FHA financing after World War II. The FHA mortgage money exceeded the costs of construction, and the taxpayer removed this excess from the corporation by "redeeming" a class of stock which had been created in anticipation of the existence of such excess proceeds. The respondent determined in the notice of deficiency that the redemption price was taxable as ordinary income under section 22(d), I.R.C. 1939. Respondent, before trial, filed an amended answer, in which he alleged that the income was taxable as ordinary income under section 117(m), I.R.C. 1939, dealing with collapsible corporations. The taxpayer contended that the collapsible corporation issue was a new issue and that the burden of proof was on respondent. In *Spangler* we held that there was no inconsistency in relying on section 117(m), I.R.C. 1939, after originally citing section 22(a) in the notice of deficiency and overruled our prior holding to the contrary in *Thomas Wilson*, 25 T.C.

1058 (1956). We noted that there was no increase in deficiency due to the reliance by respondent on another section of the Code. In a number of other cases we have held that a new position taken by respondent is not necessarily a "new issue," particularly where the new position merely makes the original determination more specific and is not inconsistent with the original determination and does not result in an increased deficiency. *Benjamin Braunstein*, 36 T.C. 22, 68–69 (1961), and cases there cited, affd. 305 F. 2d 949 (C.A. 2, 1962), affd. 374 U.S. 65 (1963).

Petitioner relies on *Sheldon Tauber*, 24 T.C. 179 (1955). The taxpayer in that case had transferred partnership assets to a newly-formed, controlled corporation partially in exchange for notes and the corporation made payments on the notes to the shareholders. Respondent in the notice of deficiency had determined that the payments were taxable as dividends. At the hearing, respondent noted that he intended to raise an alternative argument by amended answer. The amended answer filed after the trial alleged that the organization of the corporation was a taxable transaction under section 112(c)(1), I.R.C. 1939 (sec. 351(b), I.R.C. 1954), and that the taxpayers were taxable on the "boot." We held that contention to be a new issue, not properly pleaded and not proved by respondent.

Respondent in the instant case is attempting to do more than merely narrow the issue, after taking a broad position in his notice of deficiency. In his notice of deficiency respondent stated specifically that McSpadden received income from "transactions involving the discounting of notes." The theory of his contention with respect to payment of McSpadden's notes by Superior does not relate to discounting of notes but rather to the repayment of notes. This transaction is entirely different from the transaction referred to in the notice of deficiency. We, therefore, agree with petitioner that the burden of proof with respect to the payment by Superior of obligations owing by McSpadden is on respondent.

Respondent has not borne the burden of proving that petitioner's income for the years 1960 and 1961 should be increased by payments made by Superior on notes on behalf of McSpadden. The only evidence respecting this issue is the stipulated fact that Superior made payments totaling $43,050.01 in 1960 and $73,800.01 in 1961 to the finance companies on mortgage notes on which McSpadden was liable. This establishes that McSpadden in effect received these amounts from Superior but it does not establish that the amounts are includable in McSpadden's income.

If the payments were equivalent to dividend distributions, they constituted taxable income only to the extent that Superior had earnings

and profits from which dividends could be paid. Respondent apparently contends that the payments represented dividends to McSpadden. He has cited *Schalk Chemical Co.* v. *Commissioner*, 304 F. 2d 48 (C.A. 9, 1962), affirming 32 T.C. 879 (1959), which held payment by a corporation of a stockholder's notes to be dividend distributions to the stockholder. Respondent has not shown in this case that there were earnings and profits from which Superior might have paid dividends to McSpadden. There is nothing in the record to indicate whether or not Superior had any current earnings in 1960 or 1961 or any accumulated earnings and profits. If Superior had no such earnings and profits, the payments would have constituted a return of capital to McSpadden taxable as such. Not only has respondent not shown to what extent the payments may have represented a return of capital, but he has not shown if the payments were in part a return of capital to what extent, if any, they represented capital gain.

If the payments made by Superior on behalf of McSpadden constituted loans from Superior to McSpadden, such payment would not be income to McSpadden. Respondent has not proved that the payments by Superior on behalf of McSpadden were not loans.

We therefore conclude that the amounts of $43,050.01 and $73,800.01 paid by Superior in 1960 and 1961 to finance companies on mortgage notes on which McSpadden was liable are not taxable income to McSpadden in those years.

*Decision will be entered under Rule 50.*