DON BRECKENRIDGE AND ESTATE OF MARYE M. BRECKENRIDGE, DECEASED, JAN FRENCH, INDEPENDENT PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Breckenridge v. Commissioner
Docket No. 8485-79.
United States Tax Court
T.C. Memo 1983-66; 1983 Tax Ct. Memo LEXIS 715; 45 T.C.M. (CCH) 650; T.C.M. (RIA) 83066; February 2, 1983. *715 Held: (1) Funds obtained by the fraudulent assignment of nonexistent collateral is income to P; (2) farming activity not engaged in for profit; (3) sec. 6653(a) addition imposed. Edward B. Goodrich, for the petitioners. Clyde W. Mauldin, for the respondent. WHITAKER
*716 MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to the tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(a) [1]
1972
$4,106.57
$205.33
1973
361,937.60
18,096.88
Respondent conceded the 1972 deficiency, [2] so that the issues remaining are, for the taxable year 1973, (1) whether funds obtained by the fraudulent assignment of nonexistent collateral constitute income under section 61, (2) whether petitioners engaged in farming with the intent to derive a profit, and (3) whether petitioners are liable for the addition to the tax for negligence under section 6653(a). *717 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The parties stipulated that petitioners Don Breckenridge and Marye M. Breckenridge were husband and wife and resided in Grand Rapids, Michigan, when the petition in this case was filed. Petitioners filed a joint Federal income tax return for the year at issue. Petitioner Marye M. Breckenridge died prior to trial and the Estate of Marye M. Breckenridge, Deceased, Jan French, Independent Personal Representative, was substituted as a party. For convenience and due to the nature of the transactions at issue, petitioner Don Breckenridge is hereafter referred to as "petitioner." Issue (1)
In 1936, at the age of 20, petitioner Don Breckenridge became associated with Investors Diversified Services, Inc. (hereinafter referred to as "IDS"), as an independent salesman on commission. IDS is a company headquartered in the Minneapolis-St. Paul area and is involved in the sale of mutual funds, savings certificates, tax exempt bonds and insurance. In 1946, petitioner became Divisional Manager of IDS in Grand Rapids, Michigan. Thereafter, his principal job responsibilities were training, advising and recruiting *718 sales representatives in his area, and managing the Grand Rapids office, for which he was compensated by commission based upon a percentage of the sales generated by the sales representatives under his direction. In the mid 1960's petitioner commenced borrowing substantial amounts of money from many individuals and corporations. Petitioner maintained careful books and records of the loan transactions and repayment of principal and interest, [3] reported the interest expense each year on his tax return, and gave promissory notes with respect to each transaction. Petitioner made the following interest payments to his various creditors: Year
Interest Payments
1967
$18,095.79
1968
22,186.61
1969
26,242.10
1970
38,158.52
1971
63,673.50
1972
82,871.71
1973
103,329.85
1974
102,486.42
In 1972 and 1973, he made principal repayments to various creditors of $371,805.07 and $486,850.38, respectively. *719 On January 1, 1973, petitioner's outstanding debt was approximately $980,770.38 against total assets of approximately $810,393.97. [4] These assets were largely illiquid, and included at bankruptcy $819,640 in real property, $88,320 in such personal property as household goods, books, ceramics, pictures and a camera, various vehicles, an airplane, a canoe and motor, various sports, farm and business equipment, and claims against IDS for $150,000 in deferred commissions and a $100,000 retirement account, which claims were apparently contingent upon petitioner not being discharged for cause. The debts and assets figures do not reflect living expenses incurred by petitioner in 1973 when he claimed as dependents his wife and three children, or in 1974 when he claimed as dependents his wife and two children. Petitioner reported adjusted gross income of $26,399.07 in 1972 and $11,270.42 in 1973, and itemized deductions of $82,871.71 in 1972 and $103,329.85 in 1973. *720 In January of 1973, petitioner met with Dale Discher, the Vice President of Finance and Treasurer of Amway Corporation, to propose a loan from Amway for the purpose of financing construction loans to building contractors. Discher knew petitioner through IDS and thought he was dealing in that capacity. In fact, petitioner obtained the money from Amway to meet principal and interest payments on his outstanding debts and never invested any of the money in construction loans. Petitioner received the following money from Amway by check during the taxable year 1973: Date
Amount
2/ 8/73
$ 25,000
2/13/73
30,000
2/13/73
50,000
2/28/73
36,000
3/21/73
60,000
4/25/73
50,000
5/15/73
65,000
5/30/73
34,000
7/ 3/73
50,000
8/ 7/73
30,000
9/17/73
30,000
9/28/73
40,000
11/ 8/73
50,000
12/ 4/73
50,000
12/27/73
50,000
Total
$650,000
For each check received from Amway petitioner executed a promissory note, and a security agreement which granted Amway a security interest in a specified number of shares in his Investors Stock Fund account number 0103-0406363 (hereinafter referred to as "Stock Fund"). The total number of shares in the Stock Fund given *721 Amway as security in 1973 was 41,800 shares. However, at this time petitioner owned no more than 148 shares in the Stock Fund and had previously assigned 3,200 shares as security for $50,000 received from Wilma Walkotten in 1972. In May of 1974, petitioner was forced to resign his positioin with IDS after the company's auditors had examined his books while he was on vacation. Amway soon discovered that petitioner had been fired from IDS and did not own the collateral set forth in the security agreements. Thereafter, petitioner made principal payments to Amway as follows: Date
Payment
6/ 7/74
$50,000
6/24/74
10,000
6/25/74
15,000
7/17/74
4,000
7/18/74
2,500
7/26/74
10,000
Total
$91,500
On May 28, 1974, petitioners Don and Marye Breckenridge granted to Amway, as substituted security, mortgages on six parcels of property (hereinafter Parcels 1-6). In June of 1974, Amway obtained an appraisal of the six properties valued at between $400,000 and $480,000. During the summer and fall of 1974, petitioner conceived of a plan to develop the mortgaged properties and on October 31, 1974, proposed to Amway a repayment schedule based on the scheme. Amway *722 agreed not to foreclose until petitioner had an opportunity to prepare a more definite proposal. On November 27, 1974, Exxel Engineering, Inc. (hereinafter Exxel), completed a preliminary layout of the proposed scheme indicating development costs of $598,500 and estimated market value of the completed development of $1,620,000. On November 29, 1974, petitioner presented Amway with a preliminary timetable on the liquidation of the Breckenridge real estate and payment of the Amway obligation together with a cost projection. Amway rejected the proposal. On June 27, 1975, petitioner filed a petition under the Bankruptcy Act in the U.S. District Court for the Western District of Michigan. The total debts of petitioner as of July 22, 1975, were $1,432,870 and the total assets were $1,074,620. On or about January 16, 1976, Amway filed a proof of claim with the U.S. District Court in the Breckenridge bankruptcy case. On May 12, 1976, the bankruptcy court entered an order approving a settlement agreement with Amway whereby the trustee agreed to (1) transfer the bankrupt's house and approximately 90 acres of land to Amway, (2) waive all claims against Amway for its receipt and retention *723 of interest and principal payments previously received from the bankrupt, and (3) not dispute the mortgages that Amway had received as substitute security in 1974, and to transfer title to this real estate to Amway except for the certain property (hereinafter 28th Street property) which had been previously sold. Amway received the balance of the funds from the sale of the 28th Street property after payment of the first mortgage on that property plus other expenses of sale. In exchange for these concessions by the trustee, Amway agreed to pay $275,000 and to withdraw any and all claims in the bankruptcy action. Thereafter, Amway sold the properties received from the trustee and received the following amounts: (1) Parcels 1, 3, 4 and 5,
plus Breckenridge's Farm
and Residence
$300,708.50 Less: Amount paid to Trustee
(275,000.00)
Net Proceeds
$ 25,708.50 (2) Parcel 2 (70-acre land near
Breckenridge, Michigan)
75,600.00 (3) Proceeds with respect to
28th Street Property
39,626.06 Total
$140,934.56 Petitioner's unpaid liability to Amway at the conclusion of the bankruptcy proceeding was $617,565.44, computed as follows: Total advances by Amway Corp.
$850,000.00 Less: Amount repaid subsequent to
May 1974
( 91,500.00)
Amount repaid through sales of
real estate
(140,934.56)
Unpaid liability
$617,565.44 *724 Petitioner's debt to the remaining unsecured creditors was $590,903.79, of which the trustee paid $207,802.92. The estate had insufficient assets to pay the remaining debt to the unsecured creditors in the amount of $383,100.87. Petitioner was indicted by the grand jury in the Circuit Court for the County of Kent in the State of Michigan on two charges involving false pretense and security fraud. Petitioner was tried and convicted in January 1976 in the Kent County Circuit Court for the State of Michigan on the false pretense count and the security fraud count. The security fraud conviction was later overturned and the false pretense conviction affirmed by the Court of Appeals of Michigan. Issue (2)
The income, expenses and depreciation deductions with respect to the operation of petitioner's farm in Rockford, Michigan, for the taxable years 1967 through 1974 were as follows: Year
Income
Expenses
Depreciation
Loss
1967
$ 930.98
$ 5,149.90
$ 3,432.36
($ 7,651.28)
1968
508.46
12,849.15
3,892.29
( 16,232.98)
1969
1,287.80
8,835.35
4,752.47
( 12,300.02)
1970
4,853.71
8,512.73
5,150.04
( 8,809.06)
1971
1,180.17
6,312.75
5,156.21
( 10,288.79)
1972
6,573.31
10,387.69
5,156.21
( 8,970.59)
1973
7,973.13
8,513.34
5,035.21
( 5,575.42)
1974
4,801.25
( 4,801.25)
Total
$23,307.56
$60,560.91
$37,376.04
($74,629.39)
*725 Petitioner's farm operation consisted in part of raising wheat, corn and alfalfa, and in part of breeding and raising quarter horses. The horse operation foundered when the stallion around which petitioner had hoped to build his herd died of disease after siring but a single filly. Although the stallion was insured, petitioner did not use the proceeds to purchase another stallion, as the funds were required elsewhere. If petitioner earned any money from the horse operation, it was confined to small and unsubstantiated amounts. Petitioner's children rode the horses, although no evidence was given as to whether such riding was done in a professional or recreational capacity. Petitioner spent considerable time in improving the appearance of the farm. Petitioner also improved the farm's fences, improved the farm buildings and built a horse barn, attempted to revitalize the neglected soil, and cleared 100 acres for planting in addition to the 40-50 acres with which petitioner started. Due to petitioner's full-time IDS activity, he usually worked on his farm at night, after dark. Petitioner considered the farm work to be his form of relaxation. Petitioner's only help came *726 from members of his family. Issue (3)
Petitioner's 1973 Federal income tax return was prepared by an accountant. Petitioner did not inform this person that his receipt of Amway funds was secured by nonexistent collateral or otherwise attempt to determine his proper tax liability for these funds. OPINION Issue (1)
Funds obtained by extortion, embezzlement, swindling or other unlawful activity have all been held to be taxable. Rutkin v. United States,343 U.S. 130 (1952); James v. United States,366 U.S. 213 (1961); United States v. Rosenthal,470 F.2d 837 (2d Cir. 1972); Moore v. United States,412 F.2d 974 (5th Cir. 1969); United States v. Rochelle,384 F.2d 748 (5th Cir. 1967), cert. denied 390 U.S. 946 (1968); Peters v. Commissioner,51 T.C. 226 (1968); McSpadden v. Commissioner,50 T.C. 478 (1968). A loan, however, does not constitute taxable *727 income. James v. United States,supra at 219. For tax purposes, a loan is characterized by the borrower's consensual recognition of the obligation to repay, and is thereby distinguished from the legal debt which arises irrespectively of the recipient's intent, such as arises where funds are obtained by extortion, embezzlement, and swindling. James v. United States,supra at 219; United States v. Rosenthal,supra at 842; Moore v. United States,supra at 980. Petitioner signed promissory notes, assigned security, made timely interest payments, kept careful records, and otherwise structured his receipt of funds from Amway in the form of loans. However, the mere fact that a transaction is couched in the form of a loan is not determinative of tax liability where the taxpayer fails to demonstrate that he consensually recognized his obligation to repay the funds at the time they were received. United States v. Rosenthal,supra at 841; United States v. Rochelle,supra. *728 In 1973, at the time petitioner began seeking funds from Amway, he had outstanding debts among numerous creditors of approximately $980,770.38, $485,850.38 of which was due in that year, against illiquid assets of approximately $810,393.97. Other liabilities which petitioner had to meet in 1973 included $103,329.85 interest payments and unspecified living expenses for himself, his wife and three children claimed as dependents. Petitioner reported adjusted gross income of $26,399.07 in 1972 and $11,270.42 in 1973. The evidence clearly points to petitioner's inability to repay the $650,000 received from Amway in 1973. Knowledge of one's inability to repay funds is imputed to the recipient as evidence of the lack of a consensual recognition of the debt, even though the transaction was structured in the form of a loan and even though the recipient "daily recited a litany of intention to pay." United States v. Rosenthal,supra at 842. Nor has petitioner otherwise demonstrated that he had in 1973 even a highly speculative plan for disassembling his borrowing pyramid *729 and for raising sufficient funds to meet his Amway obligations. Petitioner obtained the money from Amway to enable him to meet principal and interest payments on his outstanding debts, $589,180.23 of which became due in 1973, and not, as represented to Amway, to invest in IDS construction projects. The Exxel project, in preliminary form, required development costs of $598,500, necessitating further borrowing which would only have added to petitioner's $650,000 plus 14 percent per annum Amway debt and other outstanding obligations. In any event, petitioner did not initiate plans for the Exxel project until the summer of 1974, at which point Amway was aware of petitioner's fraud. Repayment schemes proposed in subsequent years do not bear on the recipient's consensual recognition at the time the debt is incurred, especially where such scheme is offered to stave off impending legal action. [5]
*730 Courts also look at the recipient's actual repayment to determine ability to repay at the time the debt is incurred. United States v. Rosenthal,supra;United States v. Rochelle,supra.[6] Through the bankruptcy proceeding, Amway was paid $140,934.56 of petitioner's total liability to Amway of $850,000, while petitioner's other unsecured creditors were paid $207,802.92 of petitioner's debt to them of $590,903.79. In addition to petitioner's failure to demonstrate his ability to repay at the time he incurred the debt, the evidence points conclusively to his intent not to repay. Petitioner's fraudulent assignment of bogus collateral; [7] his empty promises that the funds were to be invested in IDS construction projects, United States v. Rochelle,supra, and his subsequent receipt of funds secured by bogus collateral in 1974 all indicate his lack of intent to disassemble his pyramid and repay Amway. A vague and unsubstantiated intent to repay a debt *731 does not satisfy the consensual recognition requirement. We are unable to find that petitioner had any more of an intent to repay Amway than did the taxpayer in McSpadden v. Commissioner,supra at 489, where we held: It is likely that every embezzler and some swindlers justify their actions to themselves by convincing themselves that they intent [sic] to return or repay the illegally obtained funds. Since thought or "plans" do not cause the illegally obtained funds to be "loans," such a rationalization is not even an intention to repay as the term is used in determining whether an amount received by an individual is a loan. At most the recipient of illegal funds has some vague hope that he will replace or repay the amount illegally obtained. In light of petitioner's inability to repay Amway at the time he received the funds and the objective facts which indicate his intent not to repay, we conclude that petitioner's unsubstantiated testimony regarding his intent is insufficient to meet his burden of proving that he consensually recognized his obligation to repay the funds *732 at the time he received them. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. The funds therefore constitute income in the year of receipt. James v. United States,supra.
Issue (2)
Section 183 provides that in the case of an activity not engaged in for profit, the taxpayer is allowed (1) those deductions allowable regardless of whether the activity is engaged in for profit [8] plus (2) to the extent of gross income from the activity in excess of the deductions allowed above (1), those deductions which would be allowable under sections 162 and 212 were the activity engaged in for profit. The regulations under section 183 set forth nine factors which are to be applied in determining whether an activity is not engaged in for profit. [9]Section 1.183-2(b), Income Tax Regs. These factors are: *733 (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar and dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. These factors are not exclusive and are to be applied according to the unique facts of each case. Accordingly, no one factor, nor a majority of nine factors, need be considered determinative. Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. per order (9th Cir., March 25, 1981); Benz v. Commissioner,63 T.C. 375 (1974). *734 Manner in which the taxpayer carries on the activity. The fact that petitioner presented no evidence of and appears not to have changed operating methods, adopted new techniques or abandoned unprofitable methods in a manner consistent with an intent to improve profitability indicates his lack of a profit motive. Section 1.183-2(b)(1), Income Tax Regs. Petitioner's failure to reinvest the insurance proceeds from the death of his stallion in the horse operation does not appear to have been prompted by a business decision to abandon the unprofitable operation, but rather by his pressing need for use of the funds to meet his debts. The time and effort expended by the taxpayer in carrying on the activity. Petitioner's IDS activity required his full time and attention, so that the farm activity was restricted to the after-dark hours. Despite this limited time available for farming, he did not employ competent and qualified persons to manage or work the farm, but relied for aid on his wife and children, whose roles and qualifications were not presented into evidence. Section 1.183-2(b)(3), Income Tax Regs.
Expectation *735 that assets used in the activity may appreciate in value. Petitioner claimed significant depreciation deductions with respect to the farm for each year entered into evidence, but presented no evidence concerning his expectation that the assets used in the farming activity were appreciating in value. Section 1.183-2(b)(4), Income Tax Regs.
The taxpayer's history of income or losses with respect to the activity. Petitioner claimed significant farm-related losses for the year in issue as well as for each year entered into evidence. He offered no evidence that such losses were attributable to starting-up costs, customary business risks or reverses, or unforeseen or fortuitous circumstances beyond his control. Petitioner was compensated for the death of his stallion by insurance. Section 1.183-2(b)(6), Income Tax Regs. See also section 1.183-2(b)(7), Income Tax Regs.
Elements of personal pleasure or recreation. Petitioner candidly testified that his farming activity constituted his relaxation. In addition, he testified that his children rode the horses, although no evidence was presented *736 that such riding was done in a professional capacity or for the purpose of training, showing or racing the horses. Recreational and personal elements of an activity are strong indicia that an activity is not engaged in for profit where such is consistent with the conclusion drawn from other relevant evidence. Section 1.183-2(b)(9), Income Tax Regs.
The above factors make clear that this successful businessman did not demonstrate a sufficient businesslike approach to an obvious financial problem that continued unabated through the years before the Court, but rather was content to continually sustain losses for a variety of personal reasons. Accordingly, petitioner has failed to demonstrate the existence of a profit motive with respect to his farming activity. Golanty v. Commissioner,supra;Dreicer v. Commissioner,78 T.C. 642 (1982). Issue (3)
Section 6653(a) provides that there shall be added to the tax an amount equal to 5 percent of the underpayment if any part of the underpayment is due to neglicence or intentional *737 disregard of rules and regulations. We feel that the imposition of this addition to the tax follows logically our finding that petitioner failed to report income which he received absent a consensual recognition of his obligation to repay. Petitioner had the responsibility to ascertain the proper tax character of the funds, which he might easily have done by disclosing the facts of the transaction to the accountant who prepared his return. Lester Lumber Co. v. Commissioner,14 T.C. 255 (1950). [10] Petitioner's sole argument with respect to this issue is that his records of receipts and payments and his treatment of the funds as loans relieves him of the addition. In view of our above finding that the funds were not received as loans, this argument is irrelevant, and, in any event, does not meet petitioner's burden of disproving respondent's determination. Enoch v. Commissioner,57 T.C. 781, 802-803 (1972); O'Donohue v. Commissioner,33 T.C. 698 (1960). We therefore find for respondent on this issue. *738 To reflect respondent's concessions with respect to the taxable year 1972, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. The year 1972 deficiency was based on respondent's determination that $75,000 received by petitioner, $50,000 from Wilma Walkotten and $25,000 from the Amway Corporation, were not loans for Federal income tax purposes and were therefore taxable income. Respondent subsequently agreed that the $25,000 Amway transaction did not occur until 1973. Petitioner was entitled to deductions from gross income sufficient to offset the remaining $50,000 at issue regardless of its proper tax character.↩
3. To the extent that the terms "principal" and "interest" refer to transactions between petitioner and Amway, they are employed merely for convenience and do not bear on the issue of whether the transactions were loans for Federal income tax purposes.↩
4. As discussed in the opinion, these figures are relevant to petitioner's burden of proving his ability to repay the funds he received from Amway in 1973. However, as petitioner made no effort to make these calculations, the Court found these figures on the available evidence as follows: ↩
Outstanding debts: 6/27/74 (stipulated)
$1,432,870.00 Principal repayments between 1/1/74 and
6/27/74
Don DeLoof
$ 750.00 Philip Roberts
4,000.00 Philip Roberts
6,400.00 Rence TerVeen
2,500.00 Al Veenstra
2,400.00 Total
16,050.00 Principal repayments between 1/1/73 and
12/31/73
486,850.38 Debt incurred between 1/1/74 and 5/15/74
Amway Corporation
($200,000.00)
Oliver Bohn
( 10,000.00)
Total
(210,000.00)
Debt incurred between 1/1/73 and 12/31/73
Amway Corporation
($650,000.00)
Airplane
( 60,000.00)
Edward Ponstein
( 15,000.00)
Rence TerVeen
( 5,000.00)
Elmer Briggs
( 10,000.00)
Elmer Briggs
( 5,000.00)
Total
(745,000.00)
Outstanding debt: 1/1/73
$ 980,770.38 Assets: 6/27/75 (stipulated)
$1,074,620.00 Principal repayments between 1/1/74 and
6/27/75
Don DeLoof
$ 750.00 Philip Roberts
4,000.00 Philip Roberts
6,400.00 Rence TerVeen
2,500.00 Al Veenstra
2,400.00 Amway
91,500.00 Total
107,550.00 Principal repayments between 1/1/73 and
12/31/73
486,850.38 Interest Payments
1974
$102,486.42 Net Business Income (Loss)
1974
$ 3,422.99 Net Farm Income (Loss)
1974
$ 4,801.25 Net Farm Income (Loss)
1973
$ 5,575.42 Total
116,286.08 Receipt of assets between 1/1/73 and
7/22/75
Amway
($850,000.00)
Oliver Bohn
( 10,000.00)
Airplane
( 60,000.00)
Edward Ponstein
( 15,000.00)
Rence TerVeen
( 5,000.00)
Elmer Briggs
( 15,000.00)
IDS (1973)
( 19,912.49)
Total
(974,912.49)
Assets: 1/1/73
$ 810,393.97 5. See, e.g., Norman v. Commissioner,T.C. Memo. 1968-40, affd. 407 F.2d 1337↩ (3d Cir. 1969).
6. See also Romano v. Commissioner,T.C. Memo. 1980-323↩.
7. See, e.g., McDaniel v. Commissioner,T.C. Memo. 1977-256↩.
8. See, for example, sec. 1.183-1(b), Income Tax Regs.↩
9. Sec. 183-1(c), Income Tax Regs., creates a presumption that an activity is engaged in for profit where certain, definite criteria are met with respect to income derived from the activity. This presumption is not applicable here so we make our determination based on the factors set out in sec. 1.183-2(b), Income Tax Regs.↩
10. See also Beaton v. Commissioner,T.C. Memo. 1980-413, affd. 664 F.2d 315 (1st Cir. 1981); Pisello v. Commissioner,T.C. Memo. 1979-143↩.